PARKER et al. v. INDUSTRIAL COMMISSION et al.

No. 5126. Decided December 7, 1931. (5 P. [2d] 573.)

*Dean E. Flanders,* of Salt Lake City, for plaintiffs.

*Geo. P. Parker,* Atty. Gen., and *M. Logan Rich,* Deputy Atty. Gen., for defendants.

ELIAS HANSEN, J.

On August 22, 1930, Martha Parker filed an application with the Industrial Commission of Utah whereby she requested that compensation be granted to her and her minor children because of the death of her husband, Wm. J. Parker. She alleged that her husband's death, which occurred on November 13, 1929, was caused by an accident and injury which he received on October 17, 1929, in the course of his employment by Fred Johnson at his mine in Bingham Canyon, Utah. Hearings were had before the Industrial Commission upon the application, and compensation was denied. Mrs. Parker prosecutes this proceeding to review the action of the commission in denying compensation.

It is admitted by all parties to this proceeding that the applicant and her minor children were dependents of Wm. J. Parker at the time of his alleged injury and death; that Mr. Parker was employed by Fred Johnson at the time in question; that Fred Johnson was an employer of labor subject to the Workmen's Compensation Act (Comp. Laws 1917, § 3061 et seq., as amended) ; and that he carried insurance with the state insurance fund at the time of the alleged accident.

This controversy arose over the commission's findings "that the death of William J. Parker was not the result of an injury sustained on October 17, 1929, while employed by J. Fred Johnson" and "on November 13th, 1929, the said William J. Parker died, the cause of death, as stated in the Death Certificate signed by W. R. Tyndale, M. D., being Staphylococcic Septicemia; Contributory: Broncho Pneumonia." It is urged on behalf of plaintiff that these findings are contrary to the evidence, and that the evidence produced

before the commission was such that the commission was bound to find that Mr. Parker died as a result of an injury which he received in the course of his employment.

We are thus required to examine the evidence which is brought here for review in so far as such evidence sheds light upon whether the deceased was or was not accidentally injured in the course of his employment, and, if so, whether such injury did or did not cause or contribute to his death.

Andrew C. Micholson testified that he was working with Mr. Parker on the day of the alleged injury and prior thereto; that Mr. Parker appeared to be in good health; that, while engaged in hoisting some timber about a week before the accident complained of, Mr. Parker was hit somewhere on the back with a small piece of timber, but that he went on working and did not complain of any injury; that about 2:30 or 3 o'clock p. m. on October 17, 1929, while he and Mr. Parker were engaged in dumping a car which was loaded with waste from the mine, the car slipped and came back, and Mr. Parker said that he got "kinked"; that he immediately sat down and complained of pain in the left groin; that he was pale and appeared to be sick; that he did not do any more work that day and did not return to work thereafter. The evidence shows without conflict that Mr. Parker became sick on the day of the alleged accident, and that he grew progressively worse until his death on November 13, 1929. He remained at his home for a few days, and was then removed to the County Hospital and later to the L. D. S. Hospital. A. J. May testified that he was a partner of Fred Johnson; that he was in charge of the work at Bingham, but the insurance policy was taken in the name of Mr. Johnson; that on October 19, 1929, he was at the mine in Bingham where he saw Mr. Micholson, who informed him that Mr. Parker was not at work but that he was "laid up with rheumatism in his legs"; that Mr. Micholson did not report that Mr. Parker had met with an accident; that a day or two after that Mrs. Parker called Mr. May, who went down to see Mr. Parker who was in terrible pain and very sick; that Mr. Parker then stated

that he thought he had strained himself in lifting or dumping a car while working at the mine.

Mrs. Parker testified that prior to October, 17, 1929, Mr. Parker was in good health; that on the evening of that day when he came home he was sick and complained of pain in the back and stated to her that he had strained himself in dumping a car at the mine.

Three doctors testified before the commission.

Dr. W. R. Tyndale testified that he was called on October 26, 1929, to see Mr. Parker in consultation with Dr. Hatch; that they discovered in a few days that Mr. Parker

"had a swollen, tender, left kidney area. He was yelling with pain and had to be under the influence of opiates all the time to relieve the pain. * * * After some days he developed a bronchial pneumonia and died. The autopsy showed that he had a large abscess of the left kidney and that he had bronchial pneumonia with multiple abscesses in the lungs, from which was recovered a pure culture staphylococcus, showing that the pneumonia was due to the same thing that had been in his blood stream and was in his kidney. The history we got was that some weeks before this he had had a boil on his arm. The boil was healed up at the time of this second illness, and that the second illness was due, in the minds of both the patient and his wife, to an injury * * * in the mine."

Dr. Tyndale further testified that, if Mr. Parker had been hit in the region of the kidney with a timber, such injury may have very easily contributed to produce septicemia; that the abscesses in the kidney were of longer duration than the abscesses in the lungs; that septicemia may come from boils, but it is not very frequent, and

"that an injury of this sort to a specific organ that is below par, puts that organ still further below par and renders it more liable to infection. If Mr. Parker had a septicemia, which I doubt, then the injury was a deciding influence. I think the injury was of very great moment in his case, because he was apparently quite well before the injury, and was never well after the injury, and he kept on having pain until his death. The autopsy shows a big abscess, and there is no question but that there is a relation between the injury and the death."

■

On cross-examination, Dr. Tyndale stated that ordinarily a strain does not injure a kidney, but a strain may be such as to tear some part of the kidney; that, if Mr. Parker slipped and twisted while lifting on a car, it might produce a strain on a kidney, and that there is no doubt but men do hurt the internal organs by lifting. The doctor stated that germs may flow in the blood stream and not be doing any damage, but a patient with septicemia is not able to work. He said:

"It is fair to say this, that if nobody had told me anything about the accident I should have thought that this man could have gone on and died without any accident, but when there is a history of an accident, and a man is unable to work from the time of the accident, then it is quite fair to say that the accident is the predisposing cause in the subsequent chain of effects."

Dr. Tyndale reported to the state board of health that the cause of Mr. Parker's death was "Staphylococcic Septicemia; Contributory: Broncho-Pneumonia."

Dr. L. N. Ossman testified that he made a careful examination of Mr. Parker a few days after he became sick; that there were no external evidences that he had been injured; that he had a fever and complained of

"rather severe urinary disturbances, that is frequency of passing his water, and irritating him with pain and a burning sensation on passing water. * * * I observed a healed boil * * * on the forearm. * * * He was very tender all through the groin and up towards the region of the left kidney. * * * I determined to my own satisfaction that there was no evidence of any rupture at that time. * * * Following the examination I requested that he give me a sample of the urine. I suspected from his history and his statements that his trouble was genito urinary disease or something. I took a sample down to the office that evening and examined it and found a considerable quantity of pus cells in the urine. Otherwise the urine was normal. * * * I considered he had an infection in the kidney and bladder, and didn't consider it had any bearing on an injury at that time. * * * I am not especially qualified to pass on diseases of the genito-urinary tract, and for that reason I don't care to pass an opinion whether an injury had anything to do with it. I will say, however, that such a condition that he presented could be present, and is very often present without any history of an injury

■

associated with it at all. * * * The finding of this boil made me conclude that was the natural origin of his infection of the genito-urinary tract, as it is quite common to have the blood stream infected, and the infection carried from boils; and the absence of other evidence to show the origin of infection it would be my natural conclusion that the boil was the origin of his blood stream infection, which in turn had involved the genito-urinary tract. My information then was as much as I have now, and as a result of that information I did not consider it an injury case."

When Dr. Ossman was asked on cross-examination if a sudden jerk could not cause a centralization of the germs in the blood stream, he answered by saying:

"I don't want to express an opinion. It may have been incidental or it may have been an aggravating condition. I am not qualified to pass such an opinion, because I think that is an opinion that should be left largely to specialists on the genito-urinary tract. It is possible that had nothing to do with it."

Dr. Floyd F. Hatch testified that he attended Mr. Parker prior to his death; that, when he was first called in, Mr. Parker was having very severe pains in his left groin and lower abdomen; that he thought Mr. Parker was having kidney colic; that a very careful examination failed to show any indication of anything wrong with Mr. Parker's kidneys; that there was no blood, pus, or albumen in his urine; that the boil on his forearm was completely healed. In the opinion of Dr. Hatch, it was reasonable to connect the death of Mr. Parker with the injury which he claimed to have received at the mine, but he did not feel the condition "so obvious that it was my duty to make a fuss and call anybody's attention to it. I understood there would likely be a hearing on the case, and it seemed just that there should be." On cross-examination Dr. Hatch testified that one may injure a kidney by slipping while dumping an ore car, but "it would be rather far fetched."

The foregoing is a brief summary of the evidence which the plaintiff contends requires a finding that Mr. Parker was accidentally injured in the course of his employment

and that such injury caused or contributed to his death. We cannot agree with that contention. Upon this record we are not prepared to say that reasonable minds may not differ as to what was the cause of Mr. Parker's death. It will be observed that the doctors who testified were not in entire accord as to the probability of any connection between Mr. Parker's sickness and any injury that he might have sustained. When pressed, none of the doctors who testified were certain that the septicemia and pneumonia with which Mr. Parker was afflicted and which were the immediate cause of his death were connected with any injury. According to them he may have become afflicted with these ailments without any injury. This court is not authorized to weigh conflicting evidence, nor is it authorized to direct which one of two or more reasonable inferences must be drawn from evidence which is not in conflict. That is the peculiar province of the Industrial Commission. Laws of Utah 1919, c. 63, § 3148-a; *Hauser* v. *Industrial Comm.* (Utah) 296 P. 780, and cases there cited.

The evidence in this case is not such as to demand, as a matter of law, a finding that the death of Mr. Parker was caused or contributed to by an injury which he received in the course of his employment. It follows that the order denying plaintiff compensation should be, and it accordingly is, affirmed.

CHERRY, C. J., and FOLLAND, and EPHRAIM HANSON, JJ., concur.

STRAUP, J.

I dissent. The deceased was 32 or 33 years of age. At the time of the alleged injury and prior thereto he was strong and able-bodied. He had been working for his employer for a year or more steadily engaged in underground mining, doing hard manual labor, mucking and tramming. The widow testified that on the morning of the day of the accident when he left the house to go to work he then was and prior thereto had been in "perfect health," had not

complained of any ailment of any kind, that he never felt better, and before he left ate a hearty breakfast. One of his employers who frequently saw him at work testified that up to the time of the accident "there was not anything to indicate that he was suffering from any disease or infection and that he was a beautifully built man, stocky, and a good husky fellow," and that there was not anything to incapacitate him from doing his work. As to that, the evidence is without any substantial conflict. There was evidence to show that a week or so prior to the accident the deceased had a boil on his wrist, but at the time of the accident had healed up, as some of the physicians testified, there was only a scar left and that he had had a boil would not be noticed, unless attention was called to it. The evidence, however, without dispute shows that the boil in no particular kept the deceased from doing, or interfered with, his work. In hoisting timbers about a week before the accident complained of, a piece of timber fell from above and struck the deceased on the back. He complained of it at the time, but continued on his work without further complaint.

On the day of the accident, October 17, 1929, the deceased and his companion were mucking, tramming, and running mining cars loaded with muck out of the mine and pulling them up the canyon a short distance and dumping them. They prior to the injury on that day had mucked and dumped about fourteen cars. The tramming was heavy work, as the cars had to be pulled up grade and dumped. About one hour before quitting time in the afternoon while attempting to dump a car loaded with muck and while the deceased and his companion had hold of the car and were lifting it, the deceased, as testified to by his companion, "slipped some way and the end of the car came back and slipped out of my hands and I said 'My God, I damn sure got kinked that time' and he said 'I will say I got kinked too' and he kind of turned around and sat down and went white." He further testified that the car was heavy and that it was "about all we could do to lift it up hill"; that the deceased leaned on the car for a second or two, then

turned and sat down and complained of pain over the left groin and "we thought he was ruptured"; that the deceased did no more work after that, but remained in the mine until quitting time and was "kind of pale all the time and was sick or weak and limped a little as he walked out of the mine." The deceased was taken to his home in an automobile, and had difficulty in getting out of the automobile and walking into the house. He was put to bed and remained there until the 22d, when he was taken to the County Hospital and remained there until the 26th, when he was removed to a private hospital where "a blood culture showed Staphylococcus aureas, on the 30th lung symptoms developed and on November 7th Broncho-Pneumonia," and died in the hospital November 13. An autopsy was held which disclosed "Broncho-Pneumonia in both lungs, multiple abscesses in the left kidney." The death certificate filed by the attending physician stated that the cause of death was "staphylococcic septicemia, contributory broncho-pneumonia." Staphylococcus is the same as micrococcus and may be any of several bacteria or micrococcus in which the spherical cells gather in groups, including pneumococcus.

Thus it is seen that at no time prior to the accident had the deceased suffered from or complained of any ailment and had no ailment of any kind, except the boil, which as the evidence disclosed lasted only a few days and had healed up a week or more prior to the accident, and which in no particular interfered with the deceased's work, but immediately after the accident he was compelled to take to his bed and remained there under treatment until his death. The first doctor who visited the deceased was Dr. Hatch about three days after the accident, who then examined him and prescribed for him. He found him suffering severe pain in his left groin and lower abdomen. He thought he was suffering from kidney colic. The next day the wife called one of the employers and informed him that the deceased had been hurt in the mine. The employer and his physician, Dr. Ossman, called on the deceased the same day. The latter, as he testified, examined the deceased and found no con-

tusions or bruises or any external evidence of any injury and pronounced the case not an industrial case. He, however, testified that he found the patient very ill, suffering much pain, great tenderness in the groin running up towards the kidney, and "running a temperature." He took a sample of the patient's urine, the next day tested it, and found pus in it. He thereupon ordered the patient taken to the County Hospital, which, on October 22d, was done. There the patient did not improve, and, at the request of the wife, he, on the 26th, was taken to a private hospital. At that time Dr. Tyndale was called in, and from then on, he and Dr. Hatch treated the case. A blood culture was made which, as stated, showed staphylococcic septicemia; lung symptoms developed on the 30th which on November 7th resulted in broncho-pneumonia in both lungs and on the 13th the deceased died. Dr. Hatch, the next day after he first visited the deceased and on several occasions thereafter, made laboratory tests of the patient's urine and found no pus in the urine and nothing wrong with the patient's genito-urinary tract. He and Dr. Tyndale testified that the patient ran a high fever, at times was delirious, and that an autopsy was made with the result as theretofore indicated.

It was the contention of the employer and those employed by the commission to represent the state insurance fund that the cause of the infection and death was due to the boil and not to the injury. To show that, Dr. Ossman was called as a witness who had examined the patient but once, on October 21st, and had not seen or visited him thereafter. The doctor testified that "the only external evidence of any disease or injury, I observed a healed boil" on the forearm; that he found the patient very tender over the left groin and up towards the region of the left kidney, and that it was so tender that it was difficult to make a satisfactory examination; that he found the patient very ill and needed hospital attention; and that he had examined the urine and found pus in it. He further testified that:

"The finding of this boil made me conclude that was the natural origin of his infection of the genito-urinary tract, as it is quite common to have the blood stream infected, and the infection carried from boils; and the absence of other evidence to show the origin of infection it would be my natural conclusion that the boil was the origin of his blood stream infection, which in turn had involved the genito-urinary tract."

Among other things he was asked:

"Q. You heard Dr. Tyndale's testimony that the lifting and throwing, a sudden jerk on him and having a shock would cause a centralization of those germs, what do you say about that"—to which he answered: A. I don't want to express an opinion. It may have been incidental or it may have been an aggravating condition. I am not qualified to pass such an opinion, because I think that is an opinion that should be left largely to specialists on the genito-urinary tract. It is possible that had nothing to do with it."

When further asked if he was of the opinion "that the injury had nothing to do with his death," he answered:

"I am not especially qualified to pass on diseases of the genito-urinary tract, and for that reason I don't care to pass an opinion whether an injury had anything to do with it. I will say, however, that such a condition that he presented could be present, and is very often present without any history of any injury associated with it at all."

Dr. Tyndale and Dr. Hatch were also called as witnesses who, on direct and cross-examination, were examined at some length and with respect to various hypotheses submitted to them. They in substance testified that, while it was difficult to determine with certainty or with positiveness the exact origin and cause of the infection and though a strain may not ordinarily injure a kidney, yet, considering the history of the case, the fact that the boil had healed, that the deceased had suffered no ill effects from the boil, that on the day of, and prior to, the accident he was in apparent good health and not complaining of any ailment and was strong and able-bodied, working all day without complaint, mucking and tramming and dumping cars, and sud-

denly collapsed by slipping while lifting and attempting to dump a heavily loaded car, thereby straining, twisting, and wrenching his body, growing pale and immediately complaining of severe pain in his groin and toward the region of his kidney and immediately confined to his bed from which he did not arise, it was more reasonable and probable to attribute the cause of death, as they did, to the injury, rather than to the effects of the boil, and, though the origin of the infection was attributable to the boil, yet the condition may well have been aggravated by the injury. In such particular Dr. Tyndale, in the main corroborated by Dr. Hatch, testified that:

"I would like to state that an injury of this sort to a specific organ that is below par, put that organ still further below par and renders it more liable to infection. If Mr. Parker had a septicemia, which I doubt, then the injury was a deciding influence. I think the injury was of very great moment in his case, because he was apparently quite well before the injury, and was never well after the injury, and he kept on having pain until his death. The autopsy shows a big abscess, and there is no question but what there is a relation between the injury and the death.  *  *  *  I think it is fair to say that the death was caused at least indirectly by the injury sustained.  *  *  * It is fair to say this; that if nobody had told me anything about the accident I should have thought that this man could have gone on and died without any accident, but when there is a history of an accident, and a man is unable to work from the time of the accident, then it is quite fair to say that the accident is the predisposing cause in the subsequent chain of effects."

The facts upon which such conclusions were reached are not disputed. The opinions so expressed in substance are not controverted by Dr. Ossman, for, when he was asked for his opinion as to what the injury had to do with the cause of death, he, in substance, answered that he did not consider himself qualified to express an opinion, and for that reason declined to express one, of whether the injury had anything to do with the death. The commission did not find what was the cause of death. It merely found that "death was not the result of an injury sustained on October 17, 1929, while employed" by his employer.

I think the finding is against the evidence when all of it is considered together as it should be and as the commission was required to consider it, and that therefore the order refusing compensation should be vacated, and the cause remanded to the commission for further proceedings.