RUSSELL v. INDUSTRIAL COMMISSION
OF UTAH et al.

No. 5639. Decided April 22, 1935. (43 P. [2d] 1069.)

*E. LeRoy Shields* and *L. A. Miner,* both of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *F. A. Trottier,* of Salt Lake City, for defendants.

ELIAS HANSEN, Chief Justice.

Mrs. Nettie S. Russell ffor herself and three minor children filed an application with the Industrial Commission of Utah for compensation for her husband's death alleged to have been caused by an accident arising out of and in the course of his employment with the Combined Metals Reduction Company. The State Insurance Fund was, at the time complained of, the insurance carrier of the Combined Metals Reduction Company. Two hearings were had on the application. The commission denied compensation. Plaintiff has brought the cause here for review. She claims that the commission was in error in finding that "the death of William Russell was not caused nor contributed to by an accident in the course of his employment ffor the Combined Metals Reduction Company." No other question is presented for review.

The evidence shows that prior to May 29, 1934, Mr. Russell was in good health, excepting that about the 1st of March of that year he complained of athlete's foot and treated the same with some liniment which he secured from his son, who in turn had secured it from a basket ball coach; that on May 29, 1934, and for about seven years prior thereto, William

Russell was employed as a foreman in the mill of the Combined Metals Reduction Company near Tooele City, Tooele county, Utah; that about a week before May 29, 1934, a small blister appeared on one of the toes of Mr. Russell's left foot. Nothing was done by way of treating the blister, and no inconvenience was experienced therefrom until May 29, 1934. While at work on that day, Mr. Russell complained of not feeling well. When he returned from work in the evening he limped slightly, appeared to be sick, and complained of a pain in his groin. The blister on his toe had broken, and the toe was slightly inflamed. It was treated with mercurochrome. During the night he had chills and fever. The next morning Dr. Joseph L. Merriot was called. He thus describes the condition of Mr. Russell:

"At that time he had about half a degree of temperature. He complained of general pain around his entire body, his head aching and legs and arms and back. The only thing I could find physically wrong was a very red throat, that is the posterior part, a pharangitis. He thought that he had a cold a day or two before. That is the only thing I could find that day. I supposed that he just had a cold, a general cold, and prescribed for it. The next morning I went to see him and he told me that during the night that he spent a very poor night, that he had been drinking a lot of water. Evidently he had had a high temperature. Also that he had had some chills during the night. And then in talking to him he said he noticed a little pain in the left inguinal region, in the left groin. When he told me that I started to look over his leg, and found a little small blister, oh, I judge about the size of a pea on the third toe, on the dorsal surface just near the accompanying red streaks or lymphangitis up to about midway between the knee and the ankle. He had his left inguinal glands enlarged and tender. His temperature that day was high. That morning it was about 101 and one-half, and that afternoon and that night it was much higher, and he was very restless. He had the symptoms of an infection that is high temperature and high pulse rate, and tenderness in the groin. I started treatments of hot fomentations on the toe, and ice packs in the glands. And that day, that was Decoration Day, he spent a very bad day and his temperature was quite high, 102 to 103. That night he had a very poor night until towards morning he felt a little better. The next morning I went to see him about 9:30 or ten o'clock and he was feeling a little better than he had felt during the night. His temperature at that time was about 102. But

his leg had apparently cleared up. The red streaks had cleared up, and the little blister—no evidence of any further trouble or pathology, but he still complained of some pain in the left inguinal region. The tenderness was increased over the glands; and he had a little pain in the left lower quadrant of the abdomen. His temperature that day—that was about 9:30 or ten o'clock in the morning—I saw Mr. Russell probably every two hours during the day until about eight o'clock at night and his temperature gradually rose until around 8 o'clock that night it was 105½ and his blood count was markedly increased. He was in severe pain, the pain was on the lower quadrant, it was very severe there, and finally required morphine to relieve the pain. He appeared to be in general shock, that is his pulse was weak and feeble but very rapid and perspiring freely, and it was a rather cold clammy perspiration, with a temperature of about 105½ at 8 o'clock that night. I talked with Mr. Russell. The case had me baffled. I talked with Mr. Russell and Mrs. Russell and told them frankly that I was not certain as to the diagnosis of the case, and I thought the best place would be to send him to the hospital where a more careful check could be made and where he could receive more complete medical attention. I was there I guess about 8 or 8:30 I imagine, and I took Mr. Russell to the hospital."

Dr. Merriot testified that in his opinion Mr. Russell died from toxic lymphangitis, which was caused by either staphylococcus or streptococcus germs entering his blood stream through the lesion left on his toe after the blister was broken. Mr. Russell remained at the Holy Cross Hospital at Salt Lake City until June 7, 1934, when he died. While at the hospital he was attended by Dr. Joseph A. Phipps, who called into consultation Dr. Sugden. Dr. Phipps, who attended Mr. Russell during his last sickness while at the hospital, made out the death certificate wherein the doctor stated that the cause of death was "toxic lymphangitis due possibly to arachnoidism." Dr. Phipps testified at one of the hearings before the commission. We quote a part of his testimony:

When Mr. Russell came to the hospital "there was a partially obliterated or healed blister on his toe in question but no red streaks at the time extending up his leg. But with that history of the blister he had and with the history of the red streaks as sent in by Dr. Merriot and the pain he had in his groin, I naturally assumed we were dealing with a lymphangitis and an extension of the poison from

his toe up the lymphatic glands, and acted upon that assumption for a day. The pains he complained of in his groin extended above his groin leading to the suspicion it might be something else probably besides what he was sent in here for. Palpation in that area elicited extreme tenderness and some involvement of a part of the bowel was suspected but the symptoms didn't quite fill—they didn't quite agree with what you would expect to find in a bowel involvement. But he complained of this quite severely and was limited to that area of the left abdomen. At this point I was very much confused about what was the matter with the patient. He was running a temperature and appeared to be very sick; and the pathology so far as we could see in the leg had cleared up. In my confusion about what the trouble could be I called Dr. Sugden who has had some experience in insect pathology—insect bites, and talked with him over the phone about my case and inquired what the symptoms of a spider bite was, and from what he told me over the phone I suspected I was dealing with that instead of lymphangitis from an injury to the toe. I asked Dr. Sugden to try to see the patient with me the next morning and go into it together to see if we could make out what we were dealing with. So he did, and from that time on the patient gradually grew worse until he died two or three days later."

Dr. Phipps further testified that the term "arachnoidism" means toxemia resulting from the bite of a black widow spider; that Mr. Russell stated that it was his custom to go out of doors at night in his bare feet; that subsequently one of the spiders was captured within four or five feet from where he was supposed to stand; that from these facts and the symptoms of his sickness it was thought that Mr. Russell might have been bitten by a spider, although he never claimed he had been so bitten; that a spider bite is painful, but that Mr. Russell did not remember of experiencing any pain when he was out of doors in his bare feet at night; that a blister such as that found on Mr. Russell's toe might have been caused by dropping something on the toe or by the rubbing of the toe against his stocking or shoe; that the germs which caused infection frequently come from the skin of the person infected. Dr. Phipps further testified that when he made out the death certificate he believed it probable that Mr. Russell received the infection which caused the toxic lymphangitis from which he died from a spider bite, but since he had

learned more of the history of the case he did not know what caused his death.

An autopsy was performed on the body of Mr. Russell soon after he died. Dr. Sugden, who had been called in consultation by Dr. Phipps, assisted in performing the autopsy. He testified the autopsy did not definitely show the nature of the infection which caused the lymphangitis from which Mr. Russell died; that so far as the autopsy showed such infection may have come from a spider bite or from some other source. It was possible, but not probable, the infection come from an athlete's foot.

Dr. Orin A. Ogilvie, whose profession is that of clinical pathology, was asked a number of hypothetical questions based upon the evidence of the other doctors. In answer to a question asked, he stated that:

"In all probability he (Mr. Russell) developed a septic infection from this blister on the toe which produced his lymphangitis, evidently a blood stream infection. In all probability it was a streptococcus. That would be the picture. And the various localizations mentioned, having lymphangitis, and localized cellulitis, and some peritonitis, and pleurisy, and other pictures of it were undoubtedly localized."

In answer to another question as to the cause of the blister, he answered:

"Undoubtedly microbes as supplied by his skin. Usually such microbes don't live in that dust such as found at this mill. Therefore it is more than likely they were supplied by the individual himself."

When asked with respect to the nature of athlete's foot, he answered:

"Well the condition is usually between the toes, more often between the fourth and fifth toes, but it may extend to any region around and between the toes. In very mild cases it may be just a blister and masseration of the skin and that is all it amounts to in a vast majority of cases. At the University of Pennsylvania out of six or seven thousand, 60% of the students had it. It may spread to produce various kinds of complicated infection."

In answer to a question as to what in his opinion caused the infection of Mr. Russell's toe, he answered:

"Undoubtedly microbes as supplied by the skin."

He further testified that heat and moisture are always conducive to making athlete's foot worse; that he did not think athlete's foot essential or absolutely necessary to the production of an infection or the production of a blister such as described. It was one of the possibilities and one of the probabilities of the cause of the blister in view of the history given, because athlete's foot is usually not healed when they say it is healed. They make it better by treating, and it will flare up again.

The evidence further shows that in the mill where Mr. Russell was employed there was considerable dust which was as fine as flour; that the dust was caused by the crushing of the ore which was run through the mill; that much of the dust lodged in and passed through the clothes worn by the workmen. An attempt was made on behalf of the plaintiff to show that the dust in the mill had a tendency to cause an infection where the workmen received a slight injury. The evidence touching such claim, however, was of but little probative value. Most of the medical testimony is to the effect that no infection could come from that source, although if the dust lodged in a wound it may well delay healing.

It is upon the evidence thus summarized that plaintiff claims the commission was bound, as a matter of law, to find that Mr. Russell died as the result of an accidental injury arising out of or in the course of his employment. The evidence in this record is not such as to warrant this court in disturbing the finding complained of. While the medical testimony clearly indicates that the infection which caused the lymphangitis from which Mr. Russell died originated in the blister on his toe, the evidence is far from satisfactory as to what caused the blister when it first appeared, and when and how it became infected. Upon these matters there is considerable speculation on the part of the doctors who

testified at the hearing. Mr. Russell was likewise apparently in doubt about such matters, because he did not recall having been injured either in the mill or elsewhere.

By express statutory provisions and by a long line of decisions of this court we are precluded from weighing conflicting evidence and making findings of fact. That is the province of the commission. The duties of this court are limited to a determination of questions of law. We may interfere with the commission's findings of fact in those cases where an award is granted without support of competent evidence, and, likewise, where an award is denied against uncontradicted evidence without any reasonable basis for disbelieving the same. In such cases a question of law is presented for determination; otherwise, the findings of the commission must be affirmed. Among the numerous cases from this jurisdiction which announce the foregoing doctrine are *Hauser* v. *Ind. Comm.*, 77 Utah 419, 296 P. 780; *Parker* v. *Ind. Comm.*, 78 Utah 509, 5 P. (2d) 573; *Peterson* v. *Ind. Comm.*, 83 Utah 94, 27 P. (2d) 31, and *Ostler* v. *Ind. Comm.* 84 U. 428, 36 P. (2d) 95.

In the instant case there is no direct evidence as to when, how, or where Mr. Russell received the blister on his toe. He may have received the injury while he was working at the mill, but he may, so far as the evidence discloses, have received it elsewhere. When any one of two or more inferences may reasonably be drawn from the evidence, this court is not authorized to direct which inference must be drawn, and, likewise, when, as in the instant case, it is somewhat of a speculation as to where or how the deceased received the injury complained of, this court is precluded from directing an award. To entitle the plaintiff to prevail upon this review the evidence must be such that the only reasonable inference permissible is that Mr. Russell received an accidental injury growing out of or in the course of his employment and that such injury resulted in his death. The evidence before us does not measure up to that standard.

The commission may well have entertained grave doubt as to when and where Mr. Russell received the blister on his toe.

In such case the order denying compensation must be affirmed. Such is the order.

FOLLAND, EPHRAIM HANSON, MOFFAT, and WOLFE, JJ., concur.