## O'BRIEN v. INDUSTRIAL COMMISSION et al.

No. 5773. Decided July 16, 1936. (61 P. [2d] 418.)

*E. M. Morrissey,* of Salt Lake City, for plaintiff.

*Joseph Chez, Atty. Gen.,* and *F. A. Trottier,* of Salt Lake City, for defendants.

FOLLAND, Justice.

This is a certiorari to review a decision of the Industrial Commission denying compensation for the death of T. Frank O'Brien to the plaintiff, Louise Pegg O'Brien, his widow. The deceased was injured September 4, 1934 while working for the Salt Lake City F. E. R. A. as a hoisting engineer. While walking between the crane and hoist on a plank, he

stubbed his toe on a fire rake, became unbalanced, and either fell or jumped to the ground. He sustained an incomplete fracture of the left acetabular cavity without displacement or deformity; this cavity being the socket of the ball and socket joint at the upper end of the thigh. Death occurred May 12, 1935. The State Insurance Fund, the insurance carrier, furnished medical and hospital attention and paid compensation for disability up to the time of death. O'Brien seemed at first to respond to treatment and to be recovering from the injury to his hip joint, but at the end of the month he complained he was not making satisfactory recovery. Dr. Henry Raile had charge of the case as physician. From time to time other physicians were called in consultation and to give treatment. Dr. W. N. Pugh was first called into consultation. Massage treatments were given by Mr. Wilson, a masseur. In January, O'Brien complained of pain and aching in the back, and it became apparent he was suffering from some ailment other than the fracture of the acetabular cavity. Dr. J. U. Giesy gave electrotherapy treatments, but, not producing the desired results, were discontinued. Dr. James P. Kerby took X-ray pictures of the spinal column and reported that at some previous time there had been a slight compressed fracture of the seventh dorsal vertebrae. The history of the patient showed that in 1926 he had suffered a fracture of the sixth, seventh, eighth, and tenth ribs on the left side. There was no certainty as to whether the fracture occurred at the time of the injury, September 4, 1934, or at some previous time. The doctor's opinion was that it was an older fracture than the injury to the hip. All this time the patient was losing strength and weight, and the doctors felt there was some pathology not yet recognized. On March 20, 1935, Dr. Reed Harrow, a specialist in brain and nervous diseases, came into the case. After examination he recommended an exploratory operation on the spine. This operation was performed on May 8th. Dr. Harrow reported:

"It is my opinion that Mr. O'Brien suffered from a sarcoma of the spinal column. Whether the primary lesion is in the spine or elsewhere, I am unable to say."

He further reported that life expectancy was about a month. The patient's recovery from the operation was uneventful, but he lived only a few days more than a month thereafter. An autopsy was performed by Dr. L. L. Daines in the presence of Dr. Harrow. A lengthy report of findings was made with pathological diagnosis as follows:

"Endothelioma (Ewing's tumor) of the bodies of the lumbar vertebra with metastasis of the regional lymph nodes and pleurae of both lungs. Marked edema of the spinal cord with suppuration."

All written reports of the attending physicians and of the doctors who performed the autopsy were introduced in evidence. Drs. Harrow and Giesy, among those who had treated the patient, were called and examined, as was also Dr. Daines, who performed the autopsy. Drs. O. J. La Barge and Leland R. Cowan, the one a specialist in general tumors and the other in internal medicine, were also called and gave testimony. Neither of these doctors had treated the patient, but gave their evidence based on the testimony and reports introduced. There seemed to be no doubt but that death was caused by the tumor. The inquiry narrowed to the question of whether the tumor found its cause in the accident of September 4, 1934, either arising because of the injury to the hip or the compressed fracture of the seventh dorsal vertebrae, if it were occasioned by the fall, or whether the injury of that date lighted up a pre-existing condition which hastened death.

The evidence, viewed most liberally in favor of plaintiff, would indicate that it was probable that the tumor resulted from the trauma. Had the commission found the fact to be that the trauma caused or lighted up or accelerated the tumor and had made an award of compensation, it is probable that the evidence would have supported such finding. But the commission held otherwise. Can we, on this rec-

ord, reverse the commission on the theory that the testimony showing probability is so conclusive as to require a finding that the tumor was caused by the accident? In *Bingham Mines Co.* v. *Allsop*, 59 Utah 306, 203 P. 644, 645, this court, reviewing a case where the commission had made an award of compensation, discussed the question as to whether an award could properly rest on opinion evidence of probability. The court defined "probability" as follows:

"Appellants insist that 'a finding under the Workmen's Compensation Act * * * cannot rest upon mere conjecture, probability, or possibility.' With the elimination of the word 'probability' the quoted statement is unobjectionable and meets with our approval. However, there can be no doubt about the proposition that a finding of the Commission may properly rest upon probabilities. The word 'probable' is defined in Bouvier's Law Dictionary, vol. 3, page 2728, as, 'having the appearance of truth; appearing to be founded in reason.' Courts have defined 'probable' as meaning, 'Having more evidence for than against' (3 Words and Phrases, Second Series, p. 1223) and, 'A probability of the existence of a thing is created when there is more evidence in favor of its existence than against it' (6 Words and Phrases, First Series, p. 5617)."

Plaintiff argues that the medical experts having testified it was probable the trauma had caused the tumor, the commission was bound to accept that view of the case and find for plaintiff. Some of the medical experts said, in effect, that there was a probability that the tumor resulted from the trauma. Nevertheless, when we review the entire evidence of the physicians we are not able to say that the commission was arbitrary or capricious in refusing to adopt that view of the evidence. The mere statement that the proposition is probable presupposes a conflict in the evidence, since the word probable as above defined means there is "more evidence in favor of its existence than against it." If there is evidence both in favor of and against a proposition, it is a matter of weighing evidence which is the prerogative of the commission and not of this court. All the evidence available bearing on the subject was before

the commission, and it was aided in reaching its result by the opinion evidence of the experts. One reading the record is forced to conclude that the probability in favor of the proposition was not strong, but instead it was rather a matter of possibility. No one of the doctors was willing to give a positive opinion that the trauma caused the tumor which brought about the death of the deceased. Isolated statements of some of the experts indicate an opinion of probability. These are quoted in plaintiff's brief and relied upon by her. A consideration of the entire testimony of each of the experts, however, leads us to conclude that their testimony does not rest on any definite opinion of probability. The following quotations indicate the uncertainty in the case and give support to the negative finding of the commission. A portion of Dr. Harrow's examination is as follows:

"Q. Can you tell us doctor what caused this particular tumor that you have described? A. I don't know what the cause of tumor is.

"Q. That is something you are unable to determine? A. I don't think anybody knows.

"Q. Is—are there theories that medical men advance as to what causes a tumor of this nature? A. Lots of theories with regard to the etiology of tumors. In regard to this particular type, all I know is what Dr. Daines told me about this particular type of tumor in which he said the tumor was directly associated with this trauma. I have seen other cases in which trauma did play a part. I am not sure.

"Q. Are you able to determine whether an injury or fall might cause such a tumor? A. I don't know how one can determine. It is a disputed question. There are certain authorities that claim that tumors do follow trauma, that trauma does have some participating factor in the formation of tumors. As far as my own opinion is concerned I don't think one can say absolutely. There seems to be an individual susceptibility to the disease. If trauma produced tumor or was the cause of tumor production we would all have them. But it appears that certain individuals are more susceptible to the cause of tumor than others; but to take one particular case and say that trauma is the cause, it cannot be stated.

"Q. Nor can you state that trauma was not the cause? A. It cannot be said that trauma did not have some influence that may have caused or aggravated it."

It will be noticed that Dr. Harrow referred to a statement made to him by Dr. Daines following the autopsy. This statement was hearsay. No inquiry was directly made of Dr. Daines while on the stand respecting the making of this statement, but his testimony clearly left the cause of the tumor in uncertainty. Dr. Daines testified as follows:

"Q. This man on September 4th, 1934, was a steam-shovel operator and he was walking between crane and hoist on a 14-inch plank and stubbed his toe on a fire rake and became unbalanced and fell to the ground, as a result of which he sustained a fractured left leg near the pelvis as described by Dr. Raile and the X-ray shows fracture of the left acetabulum. Assuming that is to be true would you have any opinion as to whether that played any part in the condition you found on autopsy? A. That is a very debatable point. Our very best authorities including Ewing who is undoubtedly the best authority on cancer in the world at the present time, assumes the possibility of relationship between trauma and a malignant growth. In his book you find, and from several other good authorities in which they assume the probable relationship between trauma and malignant growths. That is a thing very difficult to determine. So far as I know there has not been a single bit of positive proof of the relationship between trauma and cancer. In other words it has to be an assumption; it can't be proved.

"Q. It can't be disproved either? A. No.

"Q. If we have a man that prior to this accident there was no evidence of any symptoms, but then from the time he had this accident up to the date of his death he got progressively worse what would you say as to whether or not with that history the injury was a factor? A. There are three possibilities. Trauma may produce a malignant growth, or it may aggravate a malignant growth that is already present, or it may be coincident along with a malignant growth; so under all conditions it is difficult to say which one this is, whether this man's tumor was present and the injury simply called attention to it, or whether it may have been produced by injury, we can't say.

"Q. Have you heard enough from Dr. Harrow to express to this Commission your theory whether this accident played a part? A. I don't believe I could have a theory on this particular case. I think there is a possibility that following the injury there may have been the development of a malignant growth and if that were the case that would have caused death. I think the only safe thing to say is it is a · possibility and cannot be proven one way or the other. If the tumor

were already present this injury might have aggravated it and made it develop more rapidly."

### Dr. Giesy testified:

"Q. What do you think about the probability as to the injury being a causative factor? A. I am not qualified as an expert on this condition.

"Q. But you have made some study? A. To me it appears within the realm of possibility that it may have been the cause. On the other hand I could not state that it was."

### Dr. La Barge testified as follows:

"A. The testimony of the physicians who have preceded me indicates definitely that the patient died as result of the malignant tumor involvement, and the postmortem report indicates the character of the tumor involvement. The question arises as to whether or not the original injury had any definite causative relationship to the malignant involvement that the patient died from. I would not say that the injury in and of itself caused the patient's death. If the tumor had not developed the patient would undoubtedly have recovered from the initial injury. As Dr. Daines outlined this morning there are a number of hypotheses to consider. One is that the tumor was present at the time of his injury and was aggravated thereby; the second is that the tumor was not present at the time of the injury and caused by the injury; and the third is that the tumor and his injury were coincidental and might have developed a pathological condition from which he died regardless of the injury. I don't believe we can answer a question of that type in a positive or negative way. As Dr. Daines quoted Dr. Ewing this morning to the effect that Dr. Ewing believes that trauma had some relationship to the formation of malignant growths. I think it would be fair to say that there would be probably a possibility that injury may have had some relationship. However, I do not believe it was directly causative."

### Dr. Leland R. Cowan, a specialist in neoplastic diseases, that is, general tumors, gave the following testimony:

"Q. Have you an opinion as to whether or not this injury of September 4th was a factor in the death on the 11th of May? A. I have not definitely, no.

"Q. What is your best judgment as to whether or not such trauma might cause or aggravate it? A. It is possible it might * * * Injury is probably over-estimated in the development of tumor, because the real causation of the development of tumor is not definitely known. There are many ideas of what causes tumor but no definite attitude and nothing that we can say is the definite cause of tumor. One can

take into consideration that certain persons show a susceptibility to the development of tumor."

The recent decision by this court in the case of *Norris* v. *Industrial Commission*, 90 Utah 256, 61 P. (2d) 413, is in point on the principles involved, and much is there said which is applicable here. On the authority of that decision and without quoting from it, we conclude that the Industrial Commission did not act unreasonably, arbitrarily, or capriciously in finding against plaintiff on the evidence in this record.

The order of the Industrial Commission denying compensation is affirmed.

ELIAS HANSEN, C. J., and EPHRAIM HANSON, MOFFAT, and WOLFE, JJ., concur.