HOLBROOK v. INDUSTRIAL COMMISSION et al.

No. 5886.   Decided April 30, 1937.   (67 P. [2d] 224.)

*Nephi Jenson,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *F. A. Trottier,* of Salt Lake City, for defendants.

WOLFE, Justice.

Certiorari to the Industrial Commission to review an order denying compensation for the death of Eugene E. Holbrook. The uncontradicted evidence is that on the 9th day of March, 1936, deceased, while working as a night watchman and janitor for W. H. Wright & Sons Company, fell several feet down a steep stairway, apparently hitting his right hip. He came home the night of the accident about 12 o'clock, although his nightly duties did not terminate until

after 4 in the morning. He was "very ill" and his wife put him to bed. He had never been off duty during the two or three years he previously worked for the Wright Company except for vacations. He had performed his work in a vigorous, energetic manner; was always jovial and good-natured. He returned to work after five days at home. After working for several days, he again went home on the advice of his employer and never returned to work. He died June 30, 1936. Dr. Nelson was called on March 10th.

"He was suffering a lot of pain in the pelvic region. * * * I gave him sedatives for pain."

The doctor called on March 17th and found that he had returned to work on March 15th. On the 18th of March, he called again, but did not see him and understood he had recovered. He was again called on May 9th and found him suffering from "terrific chills and fever." He suspected la grippe or a severe cold, gave him medicine and called again on May 14th, when he was still having "awful chills and fever." He later had him taken to the hospital for observation, suspecting typhoid or undulant fever. These tests were negative so he was returned from the hospital to his home on May 31st. Several days afterward, the doctor was advised by the laboratory report of a streptococcic infection in the blood stream. That is the first time the doctor knew what his trouble was. "He had a generalized septicemia undoubtedly from a heart lesion." He was then sent back to the hospital and given five or six transfusions, but he died June 30th. "He died of what would be called malignant endocarditis with generalized septicemia. The following is the opinion of Dr. Nelson as to the matter of whether the accident on March 9th caused or contributed to the death:

"I can't see any connection in a direct way with the accident and the cause of death except that it was a coincident. I had not treated Mr. Holbrook prior to this time, and I did not know of him having suffered a heart lesion or whether this heart lesion developed before or after his injury."

Later he testified:

"Q. Doctor, it was testified here today that this man on March 9th had a fall? A. Yes.

"Q. And that you saw him the next day and that he returned to work approximately five days after the accident and worked for some days after, the number of days not known. Then he goes to his home and you got to see him on May 9th. It was also testified to here today that this man when he returned to work they were able to observe he was pale and weak and that the employer tried to get him not to remain; and from the time of the accident up to the time of his death it has been testified he was not the same man; that he got weaker and weaker until he finally died. Taking into consideration further the fact that prior to March 9th, 1936, he was a very active man and able to do his work around the store cleaning up and very active in his movements; and the employer stated he was vigorous in his work. With that history what would you say as to whether or not this accident did or did not contribute to his death? A. Yes, it is possible that it may have done. This was a malignant endocarditis. That means infection on the valves of the heart. * * *

"Q. Are you sure of your diagnosis without an autopsy? A. From the general picture of the case. And we know he had septicemia and we know he had a very pronounced mitral insufficiency.

"Q. Would the fall like that and the symptoms he manifested afterwards injure this sort of a heart? A. Yes I think a fall could have jarred loose some of the bacterial on the heart valves and thrown them loose in the blood stream.

"Q. Then that would be the cause of his death, would it not? A. Possibly.

"Q. What are the probabilities? A. I never saw a case of just that type, but I can readily understand it would be possible to jar loose those bacteria, because the theory of the chilling is due to turning loose in the blood stream a new supply of bacteria, and his fever would go up to 105 and 106. I can understand the possibility of it.

"Q. Of course anything is possible, but what are the probabilities? A. I should say there is a probability of it.

"Q. You think that the probabilities are that this accident was a contributing factor in this man's death? A. Well, it could be. I didn't see him for two months, and whether he had suffered a cold in the interim and started up a severe tonsilitis or infection I don't know. * * *

"Q. A man receiving that kind of a fall doesn't it cause some excitement and accelerate the heart? A. That is true.

"Q. If that were true how would it affect the heart? A. Help jar loose some of the bacteria. * * * Stimulate the pathology that existed there.

"Q. Do you think that is what happened? A. I think it is a probability. I can't think of anything else that would explain the condition.

"Q. Would you say that if this man hadn't had this fall he would have died at the time he did? A. No, but he would have eventually died of a heart condition. He may have lived for sometime.

"Q. Then you connect the fall with the death do you not? A. There is a possibility."

Thus we see under the questioning of counsel the doctor makes a transition of opinion that the cause of death and accident were merely coincident through a possibility that the accident caused the death to a probability that it did cause the death, ending with testimony that there was a "possibility" of a connection between the fall and the death.

While the testimony in this case certainly would have supported an award—in fact, seems to point rather decidedly that the fall aggravated a pre-existing condition—yet, that question was for the commission. The failure of the commission to arrive at such conclusion, but to an opposite one that the accident did not cause or contribute to decedent's death, is not arbitrary. The commission, as in the case of *Norris* v. *Industrial Comm.*, 90 Utah 256, 61 P. (2d) 413, has concluded that the evidence of such connection was not satisfactorily established. In that case there were conflicting opinions of doctors. Here there was one doctor as a witness and he himself furnishes conflicting opinions. He evidently was not very positive as to the real cause of the death. Under the rule in the Norris Case, the finding of the commission was not arbitrary. See, also, *O'Brien* v. *Industrial Comm.* 90 Utah 266, 61 P. (2d) 418, as to the effect of the testimony of "probable cause." Other cases in which this court considered the matter of opinion evidence in industrial cases are:

*Parker* v. *Industrial Comm.*, 78 Utah 509, 5 P. (2d) 573; *Stanley* v. *Industrial Comm.*, 79 Utah 228, 8 P. (2d) ; 770; *Russell* v. *Industrial Comm.*, 86 Utah 306, 43 P. (2d) 1069.

The order of the commission denying compensation is affirmed, with costs to defendants.

FOLLAND, C. J., and HANSON, MOFFAT, and LARSON, JJ., concur.