# DOLE v. INDUSTRIAL COMMISSION et al.

No. 7157.   Decided March 31, 1949.   (204 P. 2d 462.)

See 71 C. J., Workmen's Compensation Acts, sec. 912; 58 Am. Jur. 826. Workmen's Compensation: notice of injury, note, 145 A. L. R. 1263.

*Dan B. Shields,* of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen. and *F. A. Trottier,* of Salt Lake City, for respondents.

LATIMER, Justice.

Review of an order of the Industrial Commission denying plaintiff compensation for an injury to his right eye, allegedly sustained by him in an accident occurring in the course of his employment.

It is admitted that on March 26, 1946, the day when plaintiff claims to have been injured, that he was manager of the defendant, Salt Lake Laundry; that he was an employee of the laundry within the meaning of the Workmen's Compensation Act, U. C. A. 1943, 42-1-1 et seq.; that the laundry was covered by the terms of the act; and that the insurance carrier was the defendant, State Insurance Fund. While the other facts referred to later in this opinion are not admitted, they are for the most part uncontroverted.

After a hearing the commission found that plaintiff had not sustained an injury in the course of his employment on the day in question, and, therefore, denied him an award of compensation. In keeping with our previous holding, in order to warrant a reversal of this order the record must disclose such material, substantial, competent and uncontradicted evidence as to justify the conclusion as a matter of law that the commission acted arbitrarily in finding as it did. The single question, therefore, before us on this review is whether or not there is evidence which compels a finding by the commission that plaintiff sustained a compensable accidental injury in the course of his employment. To answer this question, we review the evidence in detail.

The facts set forth in chronological order are these: In May, 1945, plaintiff was examined for glasses, and with the exception of being farsighted, which is normal in persons of his age, his eyes were found to be in good condition. On March 26, 1946, he was manager of the defendant laundry and on that date, he was driving a truck out to Kearns Army Air Base. The purpose of his trip was to take a contract of the Salt Lake Laundry out to Kearns to be executed by the appropriate Air Base agent. He was driving on Redwood Road and because of being late for his appointment, he was driving at a fairly high rate of speed. The truck hit a rough spot in the road causing it to bounce and temporarily go out of control. The bouncing jolted

plaintiff and when he recovered control of himself and his car, he discovered that the vision of his right eye was blurred, and that he could not clearly see out of this eye. This is the first time he had ever encountered any trouble with his eye.

Early on the next morning (March 27, 1946), plaintiff consulted Dr. Saunders, an eye specialist, for treatment of the blurred vision. Dr. Saunders at the time of this visit claims to have been very rushed, but in his examination, he noticed the eye was very hazy and not normal. Plaintiff claims to have given Dr. Saunders the history of the injury at the time of his visit on March 27, 1946, and the doctor does not dispute this testimony. He merely claims he did not remember the history as given by plaintiff and had no written report of the statements made. The plaintiff returned the next day, was given further treatment by Dr. Saunders, his vision checked, and the right eye rated at 20-30. After a number of treatments and within 30 days after the date of the accident, the vision of the eye was impaired to such an extent that it was then rated 20-70. Dr. Saunders suggested that plaintiff consult his private physician for possible systemic disorder. Plaintiff followed this advice, was examined by his family physician and found to be in good health. During the month of June, 1946, plaintiff was treated by Dr. Saunders on at least 14 separate occasions, and during this period, the eye became progressively worse. At no time during the course of this treatment did Dr. Saunders ever diagnose plaintiff's disability as a detached retina. By August, 1946, the vision was so impaired that the injured eye was rated at 6-200. During the month of August, 1946, plaintiff was sent to Dr. White, another eye specialist, for examination. In detailing the history of his trouble to Dr. White, he made mention of and gave the details concerning the accident of March 26, 1946. Dr. White testified that his examination did not disclose the retina had been detached, but he had no doubt in the world that plaintiff had a detached retina

when he was subsequently examined by other doctors. Dr. White claimed his last examination indicated the stage was all set for such result. In his opinion, plaintiff had, at the time of the accident, suffered a minute hemmorhage of some of the capillaries of the eye and this had resulted in a progressive degeneration of the macula; that the jolting could have been the precipitating cause of the hemorrhage and injury to the eye; and that while he could not say how long the condition had existed, he was convinced some disturbance had affected the macula of the eye.

The condition of the eye continued to get worse and the medical treatment given afforded plaintiff no relief. Upon suggestion from his daughter, he proceeded to Seattle, Washington, where he was examined by doctors practicing in that city. Those eye doctors examined plaintiff on February 26, 1947, and their diagnosis established that the sight of the eye was so impaired that his vision was rated as merely light perception. Their testimony was that on that date the detached retina was readily discernible. In giving those doctors the history of his injury, plaintiff detailed the same facts and circumstances concerning the accident that he had given Dr. White. It was while under treatment of those doctors that plaintiff was first informed he had a detached retina and that his injury might be compensable. The Seattle doctors expressed doubts about the success of an operation on the eye because of the length of time the retina had been detached. Plaintiff then returned to Salt Lake and was examined by another eye specialist who was unwilling to operate because the detachment had existed for such a long period of time. When plaintiff was unable to obtain relief here, he returned to Seattle and had an operation performed. The operation was not successful, and the sight of the eye was not restored.

In view of the general wording used by the Commission in its decision in this case, we are again faced with uncertainty as to the reasons why the commission denied the award. The decision is so composed that the denial

could be based on one of two grounds: First, that the commission concluded plaintiff did not suffer an accident as claimed. Second, that assuming an accident, the commission found there was no causal connection between the accident and the subsequently disability. We repeat what was said in *Miner* v. *Industrial Commission, et al.*, 115 Utah 88, 202 P. 2d 557, that we do not commend such a finding as it is impossible for us to determine the true reason why the claim was denied. If the commission did not believe plaintiff's story as to the accident, it would have been an easy task to have so stated in its opinion. If on the other hand, it believed that plaintiff had sustained an accident but had failed to establish any causal connection between the accident and the injury, that likewise, would have been easy to so disclose. Or, if the commission had believed that plaintiff's evidence was deficient in both particulars, then the decision could have been so worded as to be indicative of failure of proof on both issues. Because of the sweeping nature of the order of denial we are compelled to review both questions, and if the findings of the commission can be sustained on either, then the award should be affirmed; otherwise, not.

Defendants in an effort to sustain a holding that the commission could find that the plaintiff did not suffer an accident rely on the case of *Smith* v. *Industrial Commission*, 104 Utah 318, 140 P. 2d 314, 316. Mr. Justice Wade in speaking for the court in that case made the following statement:

"The weakness of plaintiff's case is that there is no evidence other than his own testimony that he had any accident, or the details or effects thereof, and he is an interested witness. By the nature of the accident it is impossible to contradict his testimony. Such a situation presents an opportunity for imposition. A person who discovers he has a hernia can readily make up the details of a story which would prove that it was caused by an accident in the course of his employment. Under such circumstances he would naturally tell that it occurred while he was alone, he would describe the usual symptoms when a hernia is caused and would make a plausible explanation of why he did not report it sooner. The person making such a fab-

rication can do so knowing that no one can directly contradict his testimony. Under these circumstances would it be unreasonable for the commission to refuse to believe his story?"

.While there is some similarity between the facts of the *Smith* case and the instant one, there are also facts which make the rule of the *Smith* case inapplicable. If the rule announced in that case were to be extended to the facts in this case, then an injured employee who could not produce witnesses to the accident, might be denied recovery. The only important similarity in the facts of the two cases are that in both instances the employee was alone at the time the claimed accident occurred, and, hence, had exclusive knowledge as to whether or not an accident happened. In most other respects, the facts of the two cases are dissimilar. In the *Smith* case the applicant did not know he was injured until long after the claimed accident and he did not tell anyone of any claimed accident until after he had discovered that he had a hernia and was going to claim compensation. His first disclosure was after he had determined that he could obtain medical coverage if the injury occurred in the course of his employment. The facts which he then asserted were necessary links to complete the chain of events from accident to disability. In this case, plaintiff's immediate and subsequent actions, statements, and physical condition corroborate the history of the accident as told by him. There is not an inference from the record which casts doubt on the probability of the story told by him. There are no inconsistencies in his action and no uncertainties in his testimony. Every act on his part was consistent with his desire to find a cure for his injury and were inconsistent with a scheme to fix liability on his employer. The steps taken by plaintiff militate against a theory of an after thought to obtain compensation, inasmuch as plaintiff incurred substantial obligations and fully disclosed the manner in which he claimed the accident happened long before he knew the nature of his injury and at least a year prior to the time he was informed he might have a compensable claim. Such conduct

does not suggest a fabricated plan to obtain coverage. On the contrary, it is inconsistent with any such attempt. Had plaintiff considered the possibility of obtaining compensation prior to the suggestion made by the Seattle doctors, he in all probability would have filed his claim at an early date. One intending to mulct an insurance carrier would be inclined to protect against any possible personal liability by having the liability of the employer determined before the expenses were incurred.

To point out the consistent acts and conduct of this plaintiff, we direct attention to the following facts: The plaintiff reported to a doctor's office at the first reasonable opportunity after the claimed accident. Over the period of his treatment he notified three doctors that he first noticed the injury to his eye immediately after being jolted while driving his automobile over a rough portion of the highway. The first disclosure was made to Dr. Saunders the morning after the day of the accident. The same identical story was told to Dr. White in August, 1946, and was repeated to the Seattle doctors in February, 1947. Were we to disregard the plaintiff's testimony that he gave the history to Dr. Saunders, we still find three disclosures made prior to the time the plaintiff had any reason to believe that he would be entitled to compensation. Plaintiff was operated on in April, 1947, and not until after that time did he claim compensation. Certainly, at the time he made his disclosure of how the injury to the eye was incurred he had no idea that the facts he related would entitle him to compensation.

The uncertainty connected with the nature of plaintiff's injury; his immediately reporting for medical advice and assistance; his disclosure of the manner in which the accident occurred, without his knowledge that such a state of facts would entitle him to compensation; his consistent conduct over a long period of time, with only the thought of saving his eye sight; and, his incurring of extensive personal obligations for corrective treatment all argue strongly against the probability that he was attempting to impose

the costs of a noncompensable injury on his employer and distinguish this action from *Smith* v. *Industrial Commission,* supra.

It is contended that plaintiff's failure to file notice of his injury with his employer and the delay in filing a claim with the commission cast doubt on the reliability of the story as told by him. Under the facts of this case, we do not believe these contentions have any pursuasive force and effect for the following reasons: First, the plaintiff was the owner and manager of the corporation for which he worked and filing a report would, in effect, be only reporting to himself. Second, until some medical authority informed him of the nature of his injury, the plaintiff could hardly be expected to know that he had suffered a compensable injury. Early in the treatment of the injury there was some doubt in the minds of the specialists as to the nature of his disorder and until such time as the medical authorities could determine a causal connection between the accident and the injury, it would be unreasonable to hold plaintiff to a higher degree of knowledge.

If the commission, therefore, found that the applicant did not suffer an accident in the course of his employment, such finding is unreasonable and arbitrary and connot be sustained.

We pass now to a consideration of the second question, namely, whether or not the commission acted unreasonably and arbitrarily in finding, if it did so find, that there was no causal connection between the accident and the injury. If it were necessary for us to find that plaintiff suffered a detached retina on the day of the accident, then the commission would not have been arbitrary in making a finding to the effect that plaintiff had not established a causal connection between the accident and the injury. However, as we interpret the medical evidence a different conclusion is inescapable. We are of the opinion that the evidence compels a holding that the jolting was the precipitating

cause of the detached retina, but that the completed separation developed over a period of weeks rather than immediately upon plaintiff being jolted.

Dr. Saunders, after qualifying as an expert eye doctor, testified that there are a lot of causes of detached retina, but that he was not familiar enough with the detachment to be able to identify all the causes. He further testified that when plaintiff first came to see him, plaintiff complained of a blurring vision of the right eye and that the eye was very hazy; that on the next day, March 28, he examined the plaintiff's eye with an ophthalmoscope, and on that day he rated the vision of the right eye as 20-30 which was normal; that there was no sudden loss of vision, rather there was a gradual degenerative process from day to day; that at times plaintiff could see the building across the street, but complained of blurred outlines; that there was a haziness about the fundus and that condition is generally caused by cells being deposited within the media; that on April 25, plaintiff's vision was rated as 20-70 and on August 27, it was rated 6-200; that he considered it a toxic condition or some systemic disorder and to determine whether or not the cause might be from a systemic condition, he sent plaintiff to his family physician; that the results of this examination showed no systemic disorder; that he was not making progress in treating the injured eye; that he did not think there was a detached retina, and, if plaintiff was suffering from such a condition the condition arose after he finished treating plaintiff; that he informed plaintiff on several occasions, that he did not know what was the matter with the eye; and, that at the time of the hearing, he was unable to state the cause of plaintiff's condition.

Dr. White, a qualified eye doctor, testified that he first saw plaintiff on August 29, 1946; that on that occasion, plaintiff told him that he had hit some rough road while driving his car on March 26, 1946; that immediately afterwards plaintiff noticed haziness of vision and had a feeling like his eye was full of worms; that on plaintiff's first visit

he examined the eye and made such an examination as would reveal a detached retina; that he did not see a detachment at that time but had no doubt in the world that plaintiff had a detached retina when plaintiff was subsequently examined by other doctors; that his examination established that the stage was all set for such a result; that in his opinion, applicant had, at the time of the jolting, suffered a minute hemorrhage of some of the capillaries of the eye, and this resulted in a degeneration of the macula; that his diagnosis was macula degeneration; that indirect trauma from straining or jolting is the precipitating or final blow that produces a hole in the retina; that some disturbance had affected the macula of the eye, but he could not say how long that condition had existed; and that the jolting could have been the precipitating cause of the hemorrhage and the injury to the eye.

Dr. Jensen, who is qualified as an expert on ophthalmology, testified that he first met and examined plaintiff in Seattle, Washington, February 26, 1947; that at that time, there was a large detachment of the retina of the right eye; that he recommended that plaintiff's eye be operated on and an operation was performed on April 3, 1947; that in his opinion about 50 per cent of all detached retinas are caused by accident, plus an underlying predisposition to detachment; that myopic eyes are generally predisposed to detached retina, but Mr. Dole's eye was not myopic; that in his examination of plaintiff, he found no organic, systemic or other condition which might account for the detached retina other than by reason of an accident; that the most likely cause of plaintiff's detachment was trauma or accident. In answer to a hypothetical question based on the plaintiff's version of the accident, the medical history and his own diagnosis, Dr. Jensen testified that in his opinion it was highly probable that plaintiff's condition was traceable to the jolting plaintiff received on March 26, 1946.

Dr. Haffley, another eye specialist, testified and his testimony is in all particulars consistent with the testimony of

Dr. Jensen just detailed. In the course of his examination he did not find any organic or systemic conditions which might account for the detachment. In his opinion the most probable explanation was that the detached retina was of traumatic origin; that a detachment is essentially an undermining condition in which the retina either slowly or swiftly separates from the vascular base of the chorioid; and that in the normal course of eye the detachment gets progressively larger.

Summarized briefly, it is clear from the evidence of the plaintiff and the medical experts, that plaintiff suffered some injury to his eye at the time of the jolting, an injury of such importance that applicant remained under constant treatment for some 13 months and yet lost his sight. The Salt Lake doctors are in agreement that starting with the first examination the eye was hazy, the vision affected, and the condition became progressively worse. While neither Dr. Saunders nor Dr. White diagnosed the condition as being a detached retina, neither testified that the precipitating cause of the loss of vision could not be the jolting or the shaking. Dr. Saunders testified that he was unable to determine the cause, but he does not eliminate the jolting as a factor. Dr. White testified that apparently the eye had been injured by the jolting; that he thought there was a minute hemorrhage of some of the capillaries of the eye; that this resulted in a degeneration of the macula which eventually brought about a detached retina. The medical testimony of the Seattle doctors blends in with the testimony of Dr. White and they find the stage which Dr. White could so clearly anticipate when he treated plaintiff. Moreover, there is no dispute about the fact that at the time they examined the applicant the detachment was complete and had existed for a considerable period of time.

To support plaintiff on the second issue we have his testimony which shows the sudden and immediate effect of the jolting on the eye and the progressive degeneration over the subsequent 13 months in spite of constant medical care.

The story told by plaintiff establishes a complete chain of cause and effect from the accident to the total loss of vision. His testimony is supplemented by that of the medical experts, and when the evidence of all witnesses is considered collectively, it points so unerringly to the conclusion that the eye was accidentally injured by the sudden jolting that we can say, as a matter of law, that the commission was arbitrary in not so finding. While the detached retina does not appear to have become readily apparent until after some period of time, in analyzing the testimony of the doctors, it is apparent the final loss of vision can be traced, step by step, from the original accident. There is no break in or uncertainty about the completed chain of events and to a reasonable mind the record permits of only one conclusion —that is, that the jolting was the precipitating cause of applicant's injury.

If the commission based its denial of compensation on the ground that plaintiff had not established a causal connection between the accident and the injury, it must have done so on the theory that it was necessary for plaintiff to establish that he had a detached retina at the time he was treated by Dr. Saunders. It was not necessary for the commission to so find, as all that was required was a finding that the accident was a precipitating cause of plaintiff's ultimate disability and that the chain of causation between accident and injury was complete. In view of the evidence in the record, we conclude the commission acted unreasonably if it denied the award on this ground.

The record discloses such material, substantial, competent and uncontradicted evidence on both issues as to justify the conclusion as a matter of law that the commission acted arbitrarily in denying compensation. We, therefore, annul the order and refer the matter back to the commission for further action not inconsistent with this opinion.

WADE and McDONOUGH, JJ., concur.

PRATT, Chief Justice.

I dissent. There is sufficient conflict in the evidence to prevent our deciding that the commission could arrive at only one conclusion from that evidence.

WOLFE, Justice (dissenting).

Having read the transcript of the testimony in this case several times and parts of it with even greater care, I am astounded that the majority of the court can say that no reasonable mind could come to the conclusion as did the commission, and hence, that it was arbitrary. Section 42-1-79, U. C. A. 1943, provides in part as follows:

"The findings and conclusions of the commission on questions of fact shall be conclusive and final and shall not be subject to review; such questions of fact shall include ultimate facts and the findings and conclusions of the commission. * * *"

Over a long period of years, with occasional lapses, this court repeatedly held that under this statute, every ligitimate inference must be drawn and every reasonable doubt resolved in favor of the findings reached by the commission. If there was any substantial evidence in the record to support the findings of the commission, such findings were upheld. That is the rule contemplated by the clear and unequivocal language of the statute.

To cite and discuss all of the cases adhering to this rule would be a work of supererogation. They may be found collected in the annotation to Section 42-1-79, U. C. A. 1943, and the pocket part supplemental thereto. The rule has been so often repeated as to have become axiomatic.

In spite of the fact that it will somewhat lengthen this opinion, I shall attempt to do what the statute enjoins us to do i. e., look at the testimony to determine whether there is any substantial competent evidence to support the commission's denial of the award, or whether the commissioners as reasonable men could conclude that the evidence, be·

cause of conflicts, was not such as to convince them that Dole had suffered an accident and if he had whether the accident caused, accelerated or precipitated the injury to his eye. This is not an agreeable task because it is bad enough to lose an eye even when compensated and because were I the commission, I would have interpreted the evidence as has the prevailing opinion.

In my consideration of the evidence, I shall follow the order adopted by the prevailing opinion.

First: As to the claimed accident. There is nothing in Dole's testimony which makes it inherently incredible. Rather, it appeared to me that he was telling the truth when he testified as follows:

\* \* \* \* \*

"A. As I rode down the street, I came to a road that was rough. It was rather a rough place, and I bounced across it. I was going rather fast and my car went sort of out of control, and I slowed *down again and I looked up and I could not see anything.* This *eye was blind.* There was no sight there." (italics added)

However, I am not the fact finder. The commission is made such by law. It had the opportunity to study his demeanor. Dr. Saunders who treated him the next day and for weeks thereafter, had no recollection that he had mentioned being jolted over the highway and upon slowing down discovered a blurring of the vision of his right eye. Ever since the Smith case, 104 Utah 318, 140 P. 2d 314, was decided, we have been whittling it away by attempting to find differences between it and particular subsequent cases when we thought that the commission was unreasonable in not believing the applicant when he was the only one testifying to the purported accident. However, the Smith case followed the case of *Norris* v. *Industrial Commission,* 90 Utah 256, 61 P. 2d 413, 415, in which we held that before this court could say that the commission had found contrary to an inevitable conclusion from the evidence, *at least* six factors must exist. Among these factors are "(a) the evidence is uncontradicted" and "(c) that

the uncontradicted evidence is not wholly that of interested witnesses".

Here the evidence that plaintiff was shaken up when his car passed over rough road was uncontradicted, but it was also wholly the testimony of the applicant, clearly an interested witness, and hence, under the rule of the Norris case not required to be believed by the commission.

However, I am of the opinion that the commission came to its conclusion that Dole was not entitled to compensation, not on the ground that he did not suffer a blurring of the right eye on March 26, 1946, but either that it did not happen while he was driving or, if it did, that it was simply a manifestation of a degenerative process that had been going on before that date and which continued thereafter and that the jolting was not a material contributing cause, or, at least, that the proof in the light of the testimony of the doctors was not convincing. That was the province of the commission and not for us even though we may think the commission's judgment erroneous. This leads me to the next division of my review of the evidence.

Second: As to the jolting being the cause of the detached retina found by Dr. Jensen of Seattle on February 26, 1947.

The basis of the claim was that the jolting of the car *immediately* resulted in blurring and that this indicated a detached retina. All applicant's evidence was adduced in support of that theory. The commission heard the case on that theory. The arguments before this court and the briefs expounded the review on that theory. But the opinion, admitting that the denial of the award can be sustained on that theory, concludes that the evidence is such as to compel a finding that on another theory, to wit, that while the accident did not immediately or close thereto cause the retina to become detached, the evidence compels a holding that the jolting of the car so affected the macula so as to cause it to degenerate which in turn finally resulted in the detached retina. Even on this theory which

may furnish the ingenuity to explain why Dr. White and Dr. Saunders did not discover a detached retina although the former at least was alerted for it, and which the doctor in Seattle did find several months later, still the evidence cannot "compel" the commission to find for the applicant on this new theory. A finding by the commission is not compelled unless no reasonable mind or at least no rational mind trained to analyze and evaluate evidence could find otherwise. I am confident that reasonable minds could conclude differently on the question of whether the evidence established the fact that an accident in the course of Dole's employment caused immediately or mediately the detachment of the retina. I shall seek to establish this statement by a review of that part of the evidence upon which the commission could reasonably base a denial or base such a doubt as could reasonably be the basis for concluding that the applicant had not met his burden of proof. I need go no further than that. It is not necessary to show that of two or more possible conclusions from the evidence the commission did not choose the better or best one or the most reasonable or most logical or plausible one. It is for the commission to judge which conclusion, where the evidence may premit of two or more, is the better or the best. I fear that the court has unwittingly done just that—substituted its judgment as to the more reasonable of two conclusions. Since I personally believe that the conclusion from the evidence reached by the majority of the court is the more reasonable one, and the one I think I would have reached had I been the commission, I believe I can be quite objective in my analysis; and objectivity is the key note to the mental process of determining whether reasonable minds could reach different conclusions. If the test were subjective, every time there was a disagreement among the members of this court, there would be evidence that reasonable minds could differ assuming that the members of the court are actuated by reason and trained in analysis and evaluation of evidence, an assumption not difficult to make. But objectively determining whether trained rea-

sonable minds could differ is sometimes one of the most difficult feats required by the law. It requires the investigating judge not only to divorce himself from the conclusion which he has arrived at from reading the evidence, but if it differs from the conclusion of the fact finding body, to examine the conclusion of that body in order to see if it has a basis in reason. And this means that he must use not the standard supplied by his reason, but test it from the standpoint of whether it lies within the permissible range of conclusions which any reasoning mind trained to analyze and evaluate evidence might or could arrive at after reading the same evidence. If he finds that the conclusion of the fact finding body does fall within this permissible range of conclusions he must affirm it even though he thinks his own far the more reasonable and preferable conclusion.

It is odd that where a jury reaches a conclusion of fact supported by only a little substantial competent evidence we have slight difficulty in applying the correct mental process even though we may not be in accord with the verdict. But in the case of the Industrial Commission whose findings and fact conclusions we are enjoined by the legislature not to interfere with, we encounter difficulty in a case like this where the test outlined above would reveal that its conclusion had a basis in reason and could not, therefore, be arbitrary as that term is used in the law. I am quite convinced that our failure lies in the inability in some cases to refrain from applying our judgment and evaluation of the evidence rather than to canvass the judgment of the commission as above expounded.

There is in the record substantial and competent evidence that as late as August, 1946 (more than five months after the alleged accident) the plaintiff did not have a detached retina, and any diminishing of his visual acuity was caused by internal ocular deterioration due to toxic or systemic causes.

Dr. Saunders, who examined plaintiff the day after the purported accident occurred, testified that at that time plaintiff's eye was hazy. On the next day plaintiff had 20-30 vision in the right eye, which was normal vision. The doctor did not recall being told nor did he have a record of any history of plaintiff's being shaken up by his car going over rough roads, or of any sudden loss of vision. The first that he (the doctor) learned of a detached retina was when he received a letter from the Industrial Commission (apparently after plaintiff had filed his claim for compensation).

Dr. Saunders further testified "that there was no sudden loss of vision, this was a gradual process from day to day." At times plaintiff could see the building across the street but complained of blurred outlines.

The doctor thought the plaintiff's eye was the result of a toxic condition because the arteries of the eye were small. A degenerative process seemed to be developing. There was a haziness about the fundus and that condition is generally caused by cells being deposited within the media.

On April 25, plaintiff's vision had fallen off to 20-70 and on August 27, it was down to 6-200.

Dr. Saunders did not think there was a detached retina. The indications of detached retina were not present. But there were indications, and the doctor thought, that the whole process was a degenerative process of toxic origin.

"Swelling can be a factor. Infection can be a factor * * * He always had a bad throat and * * * a bad nose." "I treated his nose and throat quite a bit."

According to the doctor this opinion was shared by others with whom he consulted. He was quite definitely of the opinion that if a detached retina occurred, it occurred after the time he ceased to treat plaintiff, i. e., after August, 1946.

It was also testified that the defect in vision caused by a detached retina is a result of mechanical rather than chemical action, and there is ordinarily no fluctuation of vision.

Dr. White testified that he first saw plaintiff on August 29, 1946; that on that occasion plaintiff told him that he had hit some rough road while driving his car, and that afterward he noticed some haziness of vision, and it "felt like his eye was full of worms;" that at that time he (the doctor) examined plaintiff; that he made such an examination as would reveal a detached retina; that the history related by plaintiff made him alert for a detached retina, but he saw no evidence of detachment of the retina, although he did see what he interpreted as a degenerative process in the retina; that he had no doubt that there was detachment of the retina when plaintiff was examined later by other doctors; that the macula which is hardly bigger than a pin head and the most sensitive spot in the eye was not functioning; that the area of the macula was red suggestive of degeneration; that he had Dole inhale emylnitrate which dilates the capillaries of the eye permitting more blood to flow through them; that in the degeneration changes, it is very frequent that there is spasm in the vessels and that when the emylnitrate was injected, Dole could see much better which suggested spasm of the nerve and would indicate the *absence* of a detached retina; that macula degeneration such as plaintiff had at the time Dr. White examined him made the eyes prone to develop detachment of retina; that he

"thought *possibly* [italics added] he had at the time a minute hemorrhage of some capillaries that had caused a degeneration of the macula;"

that "he found" no such evidence, but that after two and a half months, the hemorrhage would be absorbed; that the degeneration process might have developed without hemorrhage by vascular change in the vessels.

The medical testimony above outlined is credible, and supports a finding that the deterioration of plaintiff's vision was not caused by the accident, if any, which happened to him. In fact, the matter boils down to a conflict in medical testimony.

The prevailing opinion, I think, has taken liberties with the testimony in that it states that Dr. White was of the opinion

"[applicant] had at the time of the accident, suffered a minute hemorrhage of some of the capillaries of the eye and this had resulted in a progressive degeneration of the macula."

I have quoted above the exact statement of Dr. White in that regard. He simply stated that a hemorrhage was possible but also that other systemic or vascular changes could produce the degeneration of the macula.

The prevailing opinion's summary of the evidence of Dr. Jensen and Dr. Haffley who examined Dole in Seattle in February, 1947, nearly a year after the purported mishap reflects the essence of their testimony. Dr. Jensen said,

"I could see no reason for the detachment and the most likely reason for it would be the alleged trauma if one cannot say that the injury was due to an accident." "Perhaps *50%* of detachments are due to accidents plus underlying predisposition to a detachment." (italics added)

Certainly the commission was not required to find that this detachment was one of that 50%.

These doctors both testified that in view of the history of the trip over the road they were of the opinion that the detachment was of traumatic origin assuming there was some pre-disposition present, but this only brings about a conflict among the doctors as can be seen from my review of the testimony of Drs. Saunders and White. The plaintiff seemingly used Drs. Jensen and Haffley largely for the purpose of attempting to discredit Drs. Saunders

and White. It would be most natural then to expect a distinct cleavage in medical opinion.

At one point in the prevailing opinion it is said that

"While neither Dr. Saunders nor Dr. White diagnosed the condition as being a detached retina, neither testified that the precipitating cause of the loss of vision *could not* be the jolting or the shaking." (Emphasis added.)

Of course not. Their testimony throughout was that they were uncertain as to its cause; hence, the conclusion of the commission denying compensation. And after the attorney who took the depositions at Seattle had done what he could to discredit the Salt Lake doctors and get what answers he wanted, the prevailing opinion says,

"The medical testimony of the Seattle doctors blends in with the testimony of Dr. White";

further, that

"Dr. White testified that apparently the eye had been injured by the jolting; that he thought there was a minute hemorrhage of some of the capillaries of the eye; that this resulted in a degeneration of the macula which eventually brought about a detached retina."

This illustrates, I think, that desire is father to the result of the prevailing opinion. I find no such evidence. I have quoted Dr. White's opinion concerning the hemorrhage. He found no evidence of it. He testified on cross-examination that the jolting "could" have been the precipitating cause, but that

"it is an eye that was ready for this kind of thing. Whether this particular thing [the jolting] is the one that caused it I do not know." "He apparently had something at that time and something happened—a disturbance of the sight."

But in reaching a conclusion the commission must take all the evidence together. From an entire review of the evidence, I am confident we cannot say that in law the commission was compelled to award compensation—and

I use the word "compelled" to mean that no reasonable mind could have found otherwise.

My task in this dissent is not one of interpreting and weighing evidence or giving such emphasis to certain parts of it as would show that the commission could or should have found differently than it did; nor need I show that the conclusion which the prevailing opinion holds is imperative and compelled by the evidence, is more probably the correct one, nor even that the evidence with such inferences which may be drawn therefrom, preponderates in favor of a certain conclusion. All I desire to accomplish by this dissent is to quote or detail the evidence to a point where it can be demonstrated beyond a doubt that reasonable minds could come to different conclusions therefrom or that reasonable minds could conclude differently as to whether Dole, the applicant, had sustained the burden of proving that the ultimate detachment of the retina which Dr. Jensen discovered, had stemmed from an industrially connected injury. The prevailing opinion admits that the evidence is such that the commission was not compelled to find, in view of the testimony of Drs. Saunders and White, that the jolting directly caused the retina to become detached. That opinion holds that the commission was compelled to hold that the jolts received by Dole resulted in either starting or accelerating or precipitating a degenerative condition of the macula which ultimately resulted in the detached retina found by Dr. Jensen and Dr. Haffley. And the thin thread on which this compulsion is hung is that Dr. White thought that "possibly" the jolting may have caused a hemorrhage of the small capillaries which resulted in a gradual degeneration of the macula which in turn might cause a detachment of the retina.

I fear that the court has unconsciously usurped the function of the commission. The process by which it arrived at its conclusion that the commission was unreasonable and arbitrary consists in choosing the inferences from the evidence, weighing and comparing them and then coming to the

result which it, the court, thought more reasonable. No one could be unsympathetic to such a result because it is, as before said, sad enough to lose the sight of an eye let alone be saddled with heavy doctor bills and no compensation. I realize the difficulty of examining the evidence, not for the purpose of determining which conclusion is the more or most reasonable, but for determining whether there is any substantial competent evidence to sustain a denial of an award; and I realize how natural it is to do what the mind so easily tends to do, that is, decide for itself which conclusion from all the evidence and inferences therefrom is the most reasonable. I have gone to the trouble of pointing out wherein we have encroached on the jurisdiction of the commission and substituted our judgment for its judgment in the realm wherein it has sole authority by law to act, because I think only in that way may the mind be disciplined to leave with the commission the consequences of what we may think is a wrong conclusion of fact where there is some substantial competent evidence to support that conclusion even though it may be more reasonable to conclude otherwise.

Before closing I should like to point out that I think that some of the language used by me in my dissenting opinion in the case of *Robertson et al.* v. *Industrial Commission et al.*, 109 Utah 25, 163 P. 2d 331, 339, was not well chosen in that it lays down a test for reversal of the commission's order denying compensation which on critical analysis is ambiguous and does not altogether coincide with the "no reasonable mind" test. The elements of this latter test I think are carefully set forth in the Norris case, supra. I refer to the language in the Robertson case reading as follows:

"We have time and again held that to warrant the reversal of the commissions order denying compensation the record must disclose such material, substantial, competent and uncontradicted evidence as to justify the conclusion as a matter of law that the commission acted arbitrarily in finding as it did."

This same language is used in the prevailing opinion in this case. The language gives rise to a question as to what is meant by the words "such" and "uncontradicted", and the phrase "to justify as a matter of law" in the above quoted passage. The word "such" might be read in the sense of meaning "so much of" or "some" or "sufficient" to justify the conclusion of the commission. What was meant, of course, was that before we could reverse the commission for arbitrariness the record must disclose that no reasonable mind could come to the conclusion to which it came. As a test of whether that were the case we would examine the record and if it disclosed that all material or substantial evidence was uncontradicted in the sense that there is no opposite or inconsistent or conflicting evidence or evidence which would materially weaken the force of evidence in favor of the applicant or no evidence intrinsically discrediting to the uncontradicted evidence, we *could* reverse.

I think the Norris case furnishes the factors on which unreasonability of the commission can be based. It states:

"But in order to reverse the commission in this regard it must appear at least that (a) the evidence is uncontradicted, and (b) there is nothing in the record which is intrinsically discrediting to the uncontradicted testimony and (c) that the uncontradicted evidence is not wholly that of interested witnesses or, of (if) the uncontradicted evidence is wholly or partly from others than interested witnesses, that the record shows no bias or prejudice on the part of such other witnesses, and (d) the uncontradicted evidence is such as to carry a measure of conviction of the reasonable mind and sustain the burden of proof, and (e) precludes any other explanation or hypothesis as being more or equally as reasonable, and (f) there is nothing in the record which would indicate that the presence of the witnesses gave the commission such an advantage over the court in aid to its conclusions that the conclusions should for that reason not be disturbed.

"If the commission should decide against the uncontradicted evidence under those conditions, its decision would as a matter of law be arbitrary and capricious, which is another way of saying that it would be unreasonable." *Norris* v. *Industrial Commission et al.*, 90 Utah 256, at page 261, 61 P. 2d 413, at page 415.

It should be noted that *all* the factors (a) to (f) must be present. We cannot find the commission arbitrary as a matter of law if only some of the factors (a) to (f) both inclusive are present and certainly not if we find that the record discloses that the testimony is not uncontradicted in the sense in which uncontradicted is above used, nor can we measure the amount or quality of the testimony to determine whether there is "so much of" or "sufficient" or "some" evidence which is material; substantial, competent and uncontradicted and if we think there is enough of such evidence, reverse the commission. In my opinion the record here does not disclose that reasonable minds could not differ in their conclusions tested by the standard set forth in the *Norris* case and that therefore the evidence does not "compel" a decision for the plaintiff.