JONES et al. v. CALIFORNIA PACKING CORP. et al.

No. 7688.   Decided May 15, 1952.   (244 P. 2d 640.)

See 71 C. J., Workmen's Compensation Acts, sec. 930. Exertion causing injury within workmen's compensation statutes. 58 Am. Jur., Workmen's Compensation sec. 255; 60 A. L. R. 1316.

*Dobbs & Dobbs, Clyde C. Patterson,* Ogden, for plaintiffs.

*Clinton D. Vernon,* Atty. Gen., *Allen B. Sorensen,* Asst. Atty. Gen., *J. A. Howell* and *Neil R. Olmstead,* Ogden, for defendants.

CROCKETT, Justice.

This proceeding reviews an order of The Industrial Commission denying compensation to the plaintiffs, widow and surviving children of (Harold) Minor Jones. The issue is

whether the Commission acted unreasonably in concluding that a coronary occlusion, which was established indisputably to be the cause of death, was not an accident arising out of or in the course of his employment.

Because of the nature of the controversy herein, it is necessary to set out in detail the events just preceding the death. Mr. Jones was foreman at the pea viner of the California Packing Company at Hooper, Utah. Peas, being delicate and perishable, must be speedily handled over a brief period of time and this "campaign" as it is called, involves long working hours during the short season of harvesting peas.

As foreman, it was Jones' duty to get the pea viner going and keep in it operation. Work commenced June 28, 1950; his time card shows that he worked eight hours the 28th and eight hours the 29th. On June 30th, the plant was operated from 6:30 in the morning until 6:00 in the evening, or 11½ hours and Jones worked all of those hours that day; July 1st, the viner operated from 5:30 a. m. until 6:45 p. m., or 13¼ hours, which is also the hours he worked that day; on July 2nd, the viner operated from 2:45 a. m. to 5:00 p. m., or 14¼ hours, but Jones' card showed that he worked 15½ hours or until 6:15 p. m., after which he left for home. He milked his cows and got something to eat; as it was a hot July night, he found it difficult to sleep, but lay down on the floor to rest. He went to bed about a quarter to eleven and was up about a quarter to two and back to the viner at 2:00 a. m. on July 3rd. Things went along all right for about 45 minutes and then there was trouble with a booster motor. Deceased was required to work with it constantly. Othello Munn testified that Jones was tinkering with the motor either attempting to adjust the carburetor or cranking it continually between 2:00 o'clock on the 3rd when he came to work and the time he became sick.

Deceased was apparently all right at 6:30 in the morning when he went home to breakfast and when he returned

to work about 7:00 o'clock. He continued to work with the balky engine, squatting over it to adjust the carburetor or trying to crank it. About 8:30 to 9:00 a. m. he became ill and complained of stomach distress, a violent headache and pain in his chest; his color was bad and he appeared clammy according to several witnesses who observed him. He went outside and lay down on the ground. Shortly after 9 o'clock he went home. His wife saw him coming toward the house staggering. He told her of the same distress and also mentioned pains in his chest and back. He was sweating profusely. He lay down on the bed and within a few minutes was dead.

Mr. Jones was 39 years of age and had enjoyed good health up to that time. Both sides agree, and the pathologist's report shows unequivocally, that he died as the result of a coronary occlusion. There was discovered a pre-existing thickening of the intima (inner layer) of the coronary artery where the clot was found. The disagreement between the parties hereto devolves upon the question whether the occlusion was caused by his work. This depends upon medical testimony which will be hereinafter discussed. Before doing so, it seems well to set out some cardinal principles of our law governing cases of this character.

This court has repeatedly held that the Workmen's Compensation Act should be liberally construed to effectuate its purposes, and where there is doubt, it should be resolved in favor of coverage of the employee. See *M. & K. Corp.* v. *Industrial Comm.*, 112 Utah 488, 189 P. 2d 132.

It is settled beyond question that a pre-existing disease or other disturbed condition or defect of the body, when aggravated or lighted up by an industrial accident is compensable under the act, *Graybar Electric Co., Inc.*, v. *Industrial Comm.*, 73 Utah 568, 276 P. 161; *Thomas D. Dee Memorial Hospital Ass'n* v. *Industrial Comm.*,

104 Utah 61, 138 P. 2d 233. And also that an internal failure brought about by exertion in the course of employment may be an accident within the meaning of Sec. 42-1-43, U. C. A. 1943, without the requirement that the injury result from some incident which happened suddenly and is identifiable at a definite time and place. *Robertson* v. *Industrial Comm.*, 109 Utah 25, 163 P. 2d 331; *Thomas D. Dee Memorial Hospital Ass'n* v. *Industrial Comm.*, supra; *Hammond* v. *Industrial Comm.*, 84 Utah 67, 34 P. 2d 687; *Purity Biscuit Co.* v. *Industrial Comm.*, 115 Utah 1, 201 P. 2d 961, 966. In the latter case, Mr. Justice Wade stated:

"* * * this court is definitely committed to the proposition that where an employee suffers an internal failure or breakdown which results from overexertion in the course of his employment that such is a compensable accidental injury * * *." Citing cases.

In reviewing the record in such a case as this, the scope of inquiry is well stated in *Woodburn* v. *Industrial Comm.*, 111 Utah 393, 181 P. 2d 209, 212, wherein Mr. Chief Justice Wolfe refers to the principal cases theretofore decided, and summarizes the law with respect thereto as follows:

"The extent of review by this court in this type of case is: Did the Commission act without or in excess of its powers in denying compensation to the plaintiff? Section 42-1-78, U. C. A. 1943.

"The test applicable to this type of case to determine whether or not the Commission acted without or in excess of its powers has been clearly crystalized by previous opinions * * *.

" 'In the case of denial of compensation, the record must disclose that there is material, substantial, competent, uncontradicted evidence sufficient to make a disregard of it justify the conclusion, as a matter of law, that the Industrial Commission arbitrarily and capriciously disregarded the evidence or unreasonably refused to believe such evidence.' "

We proceed to examine the medical testimony: The plaintiffs called two doctors, E. D. Zeman and J. C. Olson, who each testified positively that it was their opinion that this occlusion and death resulted from the exertion and fatigue

caused by the work under the circumstances described just prior to Jones' death. They adhered to this view under cross-examination. Plaintiffs' case rests upon the foundation of their evidence. We then ask: Is there any substantial evidence upon which a contrary finding could reasonably be made?

The only evidence which might be construed as not in accord with that of plaintiff was that of Dr. Drew Petersen who testified for the defendant. The essence of his testimony is set forth in this answer:

"Mr. Howell: Assuming that I should put this same question to you (the hypothetical question which was put to the other doctors containing the facts surrounding the death) what would be your answer, Doctor?" "A. I can't answer the question yes or no because I don't think the medical literature from my own opinion or anybody else's opinion can say dogmatically this is a definite cause, because the medical literature is full of statements that there is some relationship between effort and coronary thrombosis; and the literature is full of statements to the effect that apparently effort has no relationship to coronary thrombosis. * * * *My own opinion is that it possibly is related in this particular case,* but I don't think you can dogmatically say that it is a cause and effect or it has no effect." (Emphasis added.)

Noteworthy is the fact that this answer was given on direct examination. The doctor, discussing the relationship of exertion to such occlusions, after stating that medical literature is full of statements pro and con on the subject, voluntarily adds this significant statement:

"My own opinion is that it *possibly is related* in this particular case, but I don't think you can dogmatically [positively] say that it is a cause * * *." (Emphasis and the interpretative word "positively" added.)

Defendants do not contend that Dr. Petersen's testimony is that the exertion did *not* cause the death. They claim that his evidence, fairly considered, is that it is impossible to tell. We do not get the same meaning from the word "possibly", as it was used by Dr. Petersen, as defendants'

contend for. It is true that when the words it is "possible" or "a possibility", are used, such terms usually connote a remote likelihood of a thing being true. However, in the context of Dr. Petersen's testimony, a fair interpretation seems to mean just the opposite, that is, that it was his opinion that in this case the exertion did cause the clot. Such understanding of his statement is at least fairly permissible and more reasonable than that claimed by the defendants.

He actually gave no opinion contrary to that of Drs. Zeman and Olson. He merely said that he could not say one way or the other. He did not say, "It is not related." He did not even say, "It is my opinion that *it possibly is not* related." What he did say was, it is my opinion that *"it possibly is related."* As a matter of prudence, he added the words, "I don't think you can dogmatically (positively) say that it is a cause \* \* \*." This appears to have been but the caution against the positiveness of the fool-hardy that any prudent doctor would use. Dr. Zeman also did this in a different way.

It should be remarked that Dr. Zeman is regarded by defendants to be the best qualified witness who testified in the case. They say of him in their brief,

"It is conceded that he has conducted more experiments, and made a greater investigation of the subject than anyone else."

When pressed on cross-examination as to being positive, he said that for one to be positive he would have to repeat the experiment under identical conditions (have the man alive again, we assume). But despite searching cross-examination, he remained firm in his opinion that the work conditions described did cause the occlusion and death in this case.

A fair analysis of Dr. Petersen's testimony is that, although he was not willing to give a positive opinion that the work conditions caused the death, as did Drs. Zeman

and Olson, that it was his opinion that the work did possibly cause the death. In other words, that there was a greater likelihood of it being so than otherwise. And if that is not the proper interpretation of his evidence, it surely cannot be said that it goes anything beyond mere uncertainty on his part.

This is not evidence of substance which could be used as a foundation upon which to reject the affirmative testimony of the other doctors which has every appearance of trustworthiness. In *Norris* v. *Industrial Comm.*, 90 Utah 256, at page 262, 61 P. 2d 413, 416, Mr. Chief Justice Wolfe said,

"The evidence contradicting as well as the evidence in favor *must have substance.*"

It was not for Dr. Petersen to say whether Drs. Zeman and Olson were sure of their opinions and thus, in effect, evaluate their testimony.

No issue is taken with the thought that the Commission is not obliged to believe evidence if there is anything inherently incredible about it, or any circumstance to warrant failure to accept it. However, where facts are proved by uncontradicted testimony of competent disinterested witnesses and there is nothing inherently unreasonable, nor any circumstance which would tend to raise doubt of its truth, it should be taken as established. Refusal to do so is an arbitrary disregard by the trier of the facts, 20 Am. Jr. 1030, Evidence, Sec. 1180; 32 C. J. S., Evidence, § 1038, p. 1089, Evidence, Sec. 1038. For a somewhat comprehensive survey of the problem of when the trier of the fact may disregard uncontradicted testimony, see annotation 8 A. L. R. 796; see also *Jensen* v. *Logan City*, 96 Utah 522, 88 P. 2d 459, and *Gagos* v. *Industrial Comm.*, 87 Utah 101, 48 P. 2d 449.

The record in this case appears to indicate that the Commission proceeded on the assumption that it could disregard competent, credible and uncontradicted evidence. That idea is expressed in the findings of the Commission. Therein it is stated:

"We do, however, hold that the commission, and the commission alone, can and must determine the ultimate issue; * * * Furthermore, *we may or may not believe the evidence* introduced to prove that the exertion, etc., singly or in combination were sufficient to charge the employment with liability * * *."

If the Commission could go so far as to refuse to believe such evidence, in the absence of anything of substance to refute it, then it certainly would possess arbitrary powers with no effective review left available to the litigant. It must be remembered that Sec. 42-1-78, U. C. A. 1943, provides that in reviews by this court

"* * * the cause shall be heard on the record of the commission as certified by it."

The questions in dispute here are not such as would permit the Commission, because of its expert knowledge and experience in a particular field, to use it in lieu of or against the evidence introduced. For cases and comments regarding that principle, see Gellhorn Adm. Law, 2d ed., pp. 553 et seq.; also *Los Angeles & Salt Lake Railroad Co.* v. *Public Utilities Comm.,* 81 Utah 286, 17 P. 2d 287.

The law does not invest the Commission with any such arbitrary power to disbelieve or disregard uncontradicted, competent, credible evidence, as it appears to have done here. It found, inter alia,

"the evidence regarding exertion, fatigue, worry is very unsatisfactory. In fact, if we believe all that evidence, we must conclude that deceased was not subjected to any of these factors in a degree materially in excess of the exertion, etc., to which all individuals in every walk of life or at home are subjected."

It also found: "There is no evidence of exertion or fatigue." Defendants claim that this is an inadvertence; that it should read "severe exertion". Conceding that, the finding, in view of the evidence concerning the type of work, under the conditions present, is plainly against the evidence and the inferences which must reasonably be drawn therefrom and which were drawn therefrom by the plaintiffs' doctors from the factual situation described to them.

On the day before his death, Jones worked at least fifteen and a half hours of hard physical effort, coupled with responsibility; had less than three hours sleep and at 2:00 a. m. was back to such work and the continuous cranking of a balky motor. Every one of ordinary intelligence knows that the repeated cranking of a motor over several hours' time, under the circumstances described, would be extraordinarily exhausting labor. Dr. Olson testified that a man working as he was in hot weather, "could not avoid experiencing exhaustion". And "exhaustion" is a strong word; it means: to be extremely tired; to be used up; to wholly expend one's strength. Dr. Zeman also very properly assumed that the deceased experienced exertion and fatigue from the facts and circumstances related to him. He thought them sufficient to cause the occlusion and death. It is impossible to reconcile the foregoing facts with the findings of the Commission that "there is no evidence of exertion or fatigue" and

"that deceased was not subjected to any of these factors in a degree materially in excess of the exertion, etc. to which all individuals in every walk of life or at home are subjected".

The Commission similarly disregarded or misinterpreted the testimony of the doctors who testified for plaintiff. It included among its findings:

"* * * We point to the fact that all of the doctors stated that they attached no significance to any of the factors such as exertion, gas, fatigue or nervous strain, standing alone, but they did say it was possible that all the surrounding circumstances over a period of two or three days *might have contributed* to the occlusion."

A reading of the cross-examination of Drs. Zeman and Olson indicates that they were required to exclude from the question the other factors, except exertion and fatigue, and then testified, that it was their opinion that the work, not that it *might have contributed,* but that it *did cause* the occlusion and death.

The Commission made this conclusion:

"We find that the coronary occlusion which caused the death of Minor Jones was not the result of an accident arising out of or in the course of his employment, nor was it contributed to by any of the conditions or activities of the deceased in connection with his employment, or by any combination of them, and if the occlusion is determined to be an accident, we find that the employment had nothing to do with the occlusion."

What has heretofore been said clearly demonstrates that this conclusion is so patently against the evidence and the reasonable inferences flowing therefrom as to manifest an arbitrary disregard of the evidence.

Defendants placed some reliance on the case of *Woodburn* v. *Industrial Comm.,* 111 Utah 393, 181 P. 2d 209, 210, in which we affirmed an order denying compensation where the plaintiff had also suffered a coronary occlusion. An analysis of the *Woodburn* case will show that there is no inconsistency between the principles announced therein and those applied here which require vacating the order of the Commission. Therein Mr. Chief Justice Wolfe carefully pointed out that the testimony for the plaintiff only went this far:

"Doctors Strandquist, Olson and Zeman testified that in their opinion physical exertion *could* constitute a contributing factor in coronary occlusion or thrombosis"

and further quoted Dr. Zeman as saying, "There is a very good possibility" that it contributed, which is the strongest testimony in the case for the plaintiff. Whereas Dr. Walker testified positively, "that there is no causal connection"

and Dr. Olson testified that in that particular case he was of the opinion that it "did not contribute to the plaintiff's condition". The Commission's findings included: "We choose to accept the testimony of Drs. Olson and Walker". As the court there observed, there was a conflict in the medical testimony and it was the Commission's prerogative to determine which it would believe. Comparing it with the instant case: There we have the positive testimony of two doctors that in their opinion that the *injury was not caused* by the work, against testimony which merely said that it *could* have been. This is practically an exact reversal of the situation with respect to the testimony present in this case as hereinabove set out and would compel the opposite conclusion: the granting of an award.

*O'Brien* v. *Industrial Comm.*, 90 Utah 266, 61 P. 2d 418, is also cited as supporting defendant's position. In that case, the most favorable testimony for the plaintiff by the medical experts was: that it was "probable" that the trauma had caused the tumor  *  *  *.  The court held that mere probability indicated that there was a likelihood either way and that for that reason the Commission was not bound to follow the contentions of the plaintiff that the injury was caused by the trauma.

A case which is so similar on facts and principle as to seem to be controlling and compel a reversal of the Commission's order here is that of *Robertson* v. *Industrial Comm.*, 109 Utah 25, 163 P. 2d 331, 332. Robertson, an employee of Colorado Animal By-Products Company, was working with a companion skinning and pulling on an unusually big horse when he became considerably distressed; seemed to feel too warm; suffered a shortness of breath. He behaved very much as did Jones. He went outdoors for air and lay down; he turned red and flushed in the face; had severe pains in his chest and arms; in about 30 minutes he drove home and died before a doctor arrived. Two physicians testified at the hearing but were unable to be positive as

to the cause of death. In its findings, the Commission stated that both doctors testified that *they thought the death* might have been caused by a coronary occlusion but they were in substantial doubt as to the cause of death, and could not be positive without an autopsy. The findings of the Commission refusing to believe the evidence in regard to exertion and to follow the testimony of the doctors closely resembles the findings in the instant case which will hereinafter be referred to.

After analyzing the evidence, this court, speaking through Mr. Justice McDonough, stated:

"While the two physicians who testified at the hearing stated they were uncertain as to the exact cause of death, Dr. J. W. Hagan testified, 'It was a heart condition; in my opinion he had coronary occlusion,' * * * Dr. Merrill L. Oldroyd, * * * stated that, 'the only way to determine the cause of death would be by autopsy, but I would assume he sustained an acute heart affliction.' "

And the court concluded that the opinion of the doctors, even though somewhat uncertain, which was not disputed, pointed so definitely to the conclusion that the heart attack and death resulted from employment that it was arbitrary and unreasonable for the Commission to disregard that evidence. The court cited and relied on the *Hammond* and *Dee Hospital* cases, supra, saying:

"The Hammond and Dee Hospital cases are the law in this jurisdiction. They establish that where a person engaged in the duties of his employment suffers an internal injury from overexertion or unusual strain in the performance of those duties, resulting disability or death is compensable. An acute heart affliction caused by overwork, unusual strain or overexertion while the employee is acting in the course of his employment, strictly speaking is an internal injury, but it is nevertheless an accident."

The circumstances in the instant case make it fit into the pattern of the law set forth in those cases. The inescapable facts are that Jones lost his life from an injury which, under our prior decisions, is classified as accidental, and

which occurred to him while he was actively engaged in doing his work. From the work conditions shown, plus the testimony of two doctors who examined him, including the best qualified pathologist obtainable, that the work caused the death, as against one doctor who merely said he couldn't be sure, and he didn't think anyone else could, but that he thought "it possibly is connected in this case", it seems dissonant to common sense and reason for the Commission to conclude that his death was not "contributed to by any of the conditions or activities of the deceased in connection with his employment", and that "the employment had nothing to do with the occlusion."

There is substantial, competent evidence which points so unerringly to the conclusion that the injury did result from the employment that we are persuaded that the Commission acted unreasonably and arbitrarily in refusing to believe it. There is no evidence of any substance to the contrary. The decision and order of the Commission are, therefore, vacated and set aside and the cause remanded for further proceedings consistent herewith.

WADE and McDONOUGH, JJ., concur.

WOLFE, Chief Justice (dissenting).

It would indeed be a flinty hearted man who would not be affected by the plight of the little family of this unfortunate and conscientious man and who would not hope that the family would receive some monetary compensation. But the economic and social problem involved is far broader than the plight of one family. If, in these heart cases, the door is opened to cover cases where the self-insurers, who are among the bigger employers of labor, are compelled to pay benefits in cases of doubtful industry-connected deaths, then in times of plentitude of labor, as contrasted to this period of comparative shortage, we may expect strict physical examination of applicants for jobs. One of the

pathetic aspects of our industrial life is to see men who should normally still have long prospective earning periods go from employer to employer only to be refused employment because a heart condition makes them an unnecessary risk in times of plentiful labor. While the conditions of our social-industrial life cannot weigh with us because our job is only to determine whether the Commission arrived at its conclusions without competent evidence, we cannot be blind to the fact that this may explain why the Commission scrutinizes these heart failure cases occurring in the course or duration of industry and why it must be satisfied that the cause is some specific even though somewhat prolonged occurrence which can definitely be attributed to industry. In these cases where the trauma or injury is both the failure of the heart and the accident, the cause of the cause is oft times difficult to trace to industry as being above and beyond the wear and tear which all action in life makes to heart deterioration.

At the outset it seems hardly necessary after all these years to say that the test of whether the Commission acted unreasonably in its conclusions is not as to whether it took the most or more reasonable view. The test is whether it acted *without* a basis of reason and the test of that is generally said to be whether any man acting with reason applied to the apposite case could have found as did the Commission. I expiated on this theme in my dissenting opinion in the case of *Dole* v. *Ind. Comm.*, 115 Utah 311, 204 P. 2d 462. In these close cases, there is always a temptation to find the Commission arbitrary when its conclusions involve hardship and seem unreasonable to us but the objective "reasonable man" test which I analyzed in the *Dole* case still pertains. The instant case I consider closer than the *Dole* case. Had I been the Commission, I think I would have found difficulty in concluding that

"there is no evidence of exertion or fatigue and that deceased was not subjected to any of these factors in a degree materially in excess of the exertion, etc. to which all individuals in every walk of life or at home are subjected to."

But I am not the fact finder. The law makes the Commission the fact finder and I, as one of the reviewers of questions of law, and of law alone under the Act, cannot say as a matter of law that there was no basis of reason for such finding. I cannot say that objectively viewed no man in the exercise of reason applied to the evidence could have found as did the Commission.

Heart failure cases previously considered by this court: In the case of *Dee Hospital* v. *Ind. Comm.*, 104 Utah 61, 138 P. 2d 233, the Commission made an award and we sustained it while in the case of *Woodburn* v. *Ind. Comm.*, 111 Utah 393, 181 P. 2d 209, the Commission refused an award and we affirmed it. Likewise, in *O'Brien* v. *Ind. Comm.*, 90 Utah 266, 61 P. 2d 418, we sustained the Commission in denying compensation. In *Gerber* v. *Ind. Comm.*, 91 Utah 479, 64 P. 2d 1281, the Commission denied an award and we sustained. In *Cherdron Construction Co.* v. *Simpkins*, 61 Utah 493, 214 P. 593, the Commission made an award which we sustained. In *Columbia Steel Co.* v. *Ind. Comm.*, 92 Utah 72, 66 P. 2d 124, where the Commission awarded compensation for death from a ruptured aorta caused by jolting while running a bulldozer, we sustained. In *Hammond* v. *Ind. Comm.*, 84 Utah 67, 34 P. 2d 687, the Commission denied an award for death from acute dilation of the heart due to strain and we reversed because of an error of concept of law by the Commission in holding that all the evidence that the heart failure was industry-connected was hearsay. True, in *Robertson* v. *Ind. Comm.*, 109 Utah 25, 163 P. 2d 331, we did reverse the Commission in denying an award. In the *Robertson* case, we reversed because we concluded that the Commission under the evidence was arbitrary in refusing an award. The writer dissented in the *Robertson* case. It may be stated that there is a presumption that the Commission acted with reason and unless it clearly appears that it did arbitrarily, that is, with no basis of reason in the matter, we should uphold the Commission.

In the instant case, three doctors presented a variation of views upon the causal relationship of the decedent's employment to the result of fatal blood clot. Dr. E. D. Zeman and Dr. J. G. Olson, called by the plaintiffs, testified that there was a causal relationship. Dr. Drew Petersen, witness for the employer, testified that

"It possibly is related in this particular case but I don't think you can dogmatically say that it is a cause and effect or it has no effect."

He testified that medical literature was replete with statements that there was no relationship between effort and coronary thrombosis; also that the contrary view is expressed. In *O'Brien* v. *Ind. Comm.*, supra, we affirmed a denial of compensation in a death case due to a tumor which it was contended was the result of an accident arising out of the employment. In answering plaintiff's contention that the Commission was bound to make an award to plaintiff because a medical expert testified that it was probable that trauma had caused a tumor, we stated [90 Utah 266, 61 P. 2d 419]:

"The mere statement that the proposition is probable presupposes a conflict in the evidence, since the word probable as above defined means there 'is more evidence in favor of its existence than against it.' If there is evidence both in favor of and against the proposition, it is a matter of weighing evidence which is the prerogative of the commission and not of this court."

Dr. Peterson in his use of the word "possibly", taken in its frame of reference meant that there is less chance of an event occurring or being caused than if its likelihood is described as probable. He meant that there was only a chance that it was industry-connected, however unlikely but not impossible. He meant to save his opinion from being dogmatic or being absolute. The word "possibly" is defined in Webster's New International Dictionary, 2d Ed., as

"In a possible manner; by possible means; * * * by merest chance; perhaps; maybe."

If Dr. Petersen's conclusion as to the causal result in this case was negative, then there was a conflict in the medical testimony properly resolved by the Commission as the fact finder. This court has only the written record before it. The Commission heard the witness, listened to the connotation of the word and the inflection in his voice as he described the causal result as being "possibly" related in this particular case. I submit that the phrase in this case may be interpreted by the fact finder without arbitrariness, as expressing the doctor's conclusion that there was a chance or possibility of a causal relationship between decedent's employment and the coronary occlusion which caused his death. Such a conclusion is negative and sufficient to sustain the Commission's denial of compensation. The findings of the Commission on conflicting medical testimony cannot be disturbed on appeal, *Campbell* v. *Eagle & Blue Bell Mining Co.*, 64 Utah 430, 231 P. 620. The idea in the main opinion that Dr. Petersen really meant to say that the exertion caused the death but possibly it had no relation to it, applied to a witness for the employer, which Dr. Petersen was, is born of a desire to harmonize his testimony with that of the other two doctors. It is not consistent either with a common sense interpretation nor with the rather plain meaning of his testimony. I submit Dr. Petersen's testimony cannot be tortured into meaning that there was a causal connection but possibly there was not. He testified and he meant that there was no causal connection but he could not be positive; possibly there was. Thus construed, there was a conflict in the testimony.

The main opinion cites somewhat cavalierly the statement that

"this court has repeatedly held that the Workmen's Compensation Act should be liberally construed to effectuate its purposes, and where there is doubt, it should be resolved in favor of coverage of the employee."

The opinion seems to have confused the duty of the Commission and this Court on review to construe the statute liberally, with the duty of the Commission to find the facts. The two are entirely different duties and if properly understood are not inconsistent. The duty to liberally construe the Compensation Act so as to effectuate its purposes arises, not from anything contained in the Act itself, but from the general admonition contained in the various Compilations and Revisions of our statutes, the latest one being the Utah Code Annotated of 1943 of which Section 2 of Chap. 2, Title 88, deals with the duty to liberally construe statutes, viz: that the statutes of the State are

"to be liberally construed with a view to effect the objects of the statutes and to promote justice."

It pertains not to questions of fact but to questions of law. The prevailing opinion cites *M&K Corporation* v. *Ind. Comm.*, 112 Utah 488, 189 P. 2d 132, 134, as holding that

"where there is doubt, it should be resolved in favor of coverage of the employee."

The case of *M&K Corporation* v. *Ind. Comm.*, supra, was a case which involved the construction of the language of the Act. The question was as to whether an accident arose out of or in the course of the employment when a father allowed his young son—too young to legally drive—to convey a truck through Sardine Canyon as a result of which the father was killed. There was no question of fact involved. In the opinion this court stated:

"We have also repeatedly held that this statute [meaning the Workmen's Compensation Act] should be liberally construed and *if there is any doubt respecting the right to compensation it should be resolved in favor of recovery.*" (Emphasis mine.)

Of course, what we meant in the *M&K* case was a doubt in statutory construction or application. Certainly we did not mean that in every doubtful case the Commission should

make an award. The doubt in the instant case is not as to the meaning of the Act. The Act over a long term of years has been construed until there is probably little doubt as to the meaning of any part of it. The doubt in the instant case is one as to a conclusion of fact from the expert testimony. This has already been discussed above. The very phrase "liberally construed" does not fit a factual situation.

The rule that pertains in respect to a factual situation is that the applicant has the burden of proof in establishing his case. If, after all the facts are considered, the Commission finds the scales in balance, the situation is left in equipoise and the applicant cannot recover. In order to recover the evidence must, qualitatively and quantitatively considered, weigh or preponderate in favor of the applicant. As to whether the evidence does so preponderate is, of course, largely a matter of the judgment of the fact finder. But unless the Commission finds without basis of reason that the burden of proof has not been met either because it chooses to believe one doctor's testimony as against two others or because it believes for other valid reasons that the failure of the heart was not industry-connected, we cannot reverse.

What would cause one man to find the proof insufficient and another ample to preponderate in favor of the applicant involves certain imponderables. Some minds are cautious, very conscientious and come to their conclusions with a great sense of responsibility and deliberation. But a slowly acting mind is not necessarily more accurate nor more sound than a fast one, and quickness of mind does not necessarily denote lack of consideration, although the impulsive, explosive, jerky or jumpy mind is more apt to be required more often to make revisions in its conclusions.

"Because there is a margin for different minds to react differently from the same evidence and even with the benefit of the imponderables, and still be within the area in which a mind may operate reasonably—that is with reason, we have in the past recognized the reasonable man test." *Sine* v. *Harper*, 118 Utah 415, 222 P. 2d 571 at page 585.

I think the "reasonable man" test is a short way of telling the judge to be objective—that is, try to determine whether in the particular matter under consideration other minds acting reasonably could come to different conclesions than he did.

HENRIOD, J., concurs in the results of the dissenting opinion by Mr. Chief Justice WOLFE.